THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PARS EQUALITY CENTER;
ONEAMERICA; PAMELA WHITEHALL
RAGHEBI; AFSHIN RAGHEBI; ZEINAB
MOHAMED HASSAN; SIRAJI ETHA
SIRAJI; MALAYEEN AHMED; REZA
AZIMI; YAHYA GHALEB; MITRA
HANNANI; NICHOLAS HANOUT;
HOSSEIN ZAMANI HOSSEINABADI;
HODA MEHRABI MOHAMMADABADI;
JOHN DOES #1-3; and JANE DOE #1,

               Plaintiffs,

    v.

MIKE POMPEO; KIRSTJEN NIELSEN;
KEVIN K. MCALEENAN; U.S.
DEPARTMENT OF HOMELAND
SECURITY; U.S. DEPARTMENT OF
STATE; and U.S. CUSTOMS AND
BORDER PROTECTION,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

**CLASS ACTION COMPLAINT**

## INTRODUCTION

1.     This lawsuit challenges Defendants' implementation of the waiver provision of

Presidential Proclamation No. 9645, "Enhancing Vetting Capabilities and Processes for

Detecting Attempted Entry into the United States By Terrorists or other Public-Safety Threats"

("Proclamation"). The Proclamation indefinitely bans millions of nationals of five Muslim-

majority countries from entering the United States. For many thousands of individuals and

families indefinitely separated by the President's ban, the Proclamation's waiver provision has,

CLASS ACTION COMPLAINT - 1
NO.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

as a practical matter, amounted to nothing more than an empty promise—in the words of Justice Breyer, merely "window dressing."

2.    Under the Proclamation, the only way that banned individuals can now gain entry to the United States is by obtaining a waiver. *See* Section 3(c), Proc. No. 9645 (hereinafter "waiver provision"). But the Proclamation's waiver provision has been implemented in such a haphazard, opaque, and capricious manner, and so few visa applicants have actually been granted waivers under the Proclamation, that the process by which waivers are supposedly granted has become part and parcel of the ban itself.

3.    Indeed, a former consular official and State Department employee has stated in a sworn declaration "that there really is no waiver," because consular officers have been instructed "to determine at all possible cost that the [visa applicant] was not eligible to even apply for the waiver." *See* Exhibit A.

4.    What is publicly known about Defendants' implementation of the Proclamation's waiver provision is consistent with this assessment.

5.    When the Proclamation went into effect, there were mass denials of waivers, regardless of whether the applicant had already had a consular interview, whether the applicant had any meaningful notice of the availability of a waiver, or whether the applicant had an opportunity to present evidence of eligibility for a waiver.

6.    There is no application form for a waiver from the Proclamation's ban. There is no information about how an individual seeking a visa can demonstrate his or her eligibility under the criteria set out in the Proclamation. There is no formal opportunity provided in the visa application process for an individual to demonstrate eligibility for a waiver. Nor do there appear to be consistent processes by which to accept and consider requests for waivers.

7.    As implemented by Defendants, moreover, the process and standard by which waivers are granted are dramatically different from what the Proclamation sets out. The few public disclosures about how the State Department is implementing the Proclamation's waiver provision indicate that consular officers are assessing visa applicants' waiver eligibility

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

pursuant to an arbitrary and ad hoc process, and under far narrower criteria than those actually set forth in the Proclamation. Numerous individuals—including every individual Plaintiff in this action—fall within the circumstances identified by the Proclamation as warranting a waiver, but have nevertheless been unable to obtain a waiver.

8.      Given the unduly restrictive manner in which Defendants have implemented the Proclamation's waiver provision, families from the five majority-Muslim banned countries remain unnecessarily separated, and cannot celebrate traditional milestones together like births, graduations, weddings, and birthdays, or provide support through illness and hardship. Institutions of higher learning cannot bring academics and students from the banned countries to pursue research or study in the United States. Employers are unable to hire or employ qualified individuals from the banned countries.

9.      The plaintiffs in this lawsuit are individuals facing indefinite separation from their families, for whom a waiver from the ban is the only way they can reunite with their families, and organizations who serve individuals in similar straits. They respectfully request that the Court enjoin Defendants from implementing or enforcing any part of the Proclamation's waiver provision in a manner that violates the Administrative Procedure Act ("APA"), the INA, the Constitution, or the Proclamation itself.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution and federal statutes. The Court has additional remedial authority under 28 U.S.C. §§ 2201-02.

11.     Venue is proper under 28 U.S.C. § 1391(e) and Local Rule § 104(e). Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States. Organizational Plaintiff OneAmerica and individual plaintiffs Pamela Whitehall Raghebi, Zeinab Mohamed Hassan, and Siraji Etha Siraji reside in the Seattle Division of this District. No real property is involved in this action.

CLASS ACTION COMPLAINT - 3
NO.

# PARTIES

12.     The Plaintiffs in this case are both individuals and organizations. The individual plaintiffs are United States citizens and foreign nationals lawfully present in the United States, whose efforts to reunite here with relatives abroad have been delayed or indefinitely thwarted by the President's executive orders ("EOs")[1] and by Defendants' implementation of the waiver provision; individuals abroad who have been left with no avenue to reunite with family and loved ones in the United States because of the EOs and the Proclamation's waiver requirement; and legally present foreign nationals from countries subject to the Proclamation who, but for the uncertainty created by the waiver process, wish to travel abroad and return to the United States.

13.     Some individual plaintiffs have approved I-130 immigrant petitions for their relatives abroad; of these, some are awaiting a decision on their immigrant visa applications and a waiver, while others have already been denied waivers and visas. Other plaintiffs are foreign nationals who have filed nonimmigrant visa petitions to visit and reunite with loved ones present in the United States, and who are either awaiting a decision or have been denied waivers and visas.

14.     All the individual plaintiffs have been forced to endure a prolonged separation from their loved ones because of the EOs and, now, Defendants' unlawful implementation of the Proclamation's waiver provision.

15.     The organizational plaintiffs serve individuals or have members and clients who, like the individual plaintiffs, are United States citizens or lawful permanent residents with relatives abroad who are nationals of a banned country and who are seeking immigrant or nonimmigrant visas. The organizational plaintiffs assert standing on their own behalf, and plaintiff Pars Equality Center also asserts standing on behalf of its clients.

---

[1] Exec. Order 13769, *Protecting the Nation From Foreign Terrorist Entry Into the United States*, 82 Fed. Reg. 8977 (Jan. 27, 2017) (hereinafter "EO-1"); Exec. Order 13780, *Protecting the Nation From Foreign Terrorist Entry Into the United States*, 82 Fed. Reg. 13209 (Mar. 6, 2017) (hereinafter "EO-2"); Proc. No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public Safety Threats*, 82 Fed. Reg. 45161 (Sept. 24, 2017) (collectively, the "EOs" or the "Orders").

CLASS ACTION COMPLAINT - 4
NO.

16.     Plaintiff Pars Equality Center ("Pars") is a 501(c)(3) non-profit corporation headquartered in Menlo Park, California, with offices in San Jose and Los Angeles, California. Pars Equality Center's offices are recognized by the U.S. Department of Justice, Office of Legal Accreditation Program.  Pars' legal staff members include licensed attorneys and accredited U.S. Department of Justice immigration representatives.

17.     Pars is a community-based social and legal services organization dedicated to helping Iranian-American and other Persian-speaking communities fulfill their full potential as informed, self-reliant, and responsible members of American society.  Since its inception in 2010, Pars has expanded its social and legal services to other immigrant and refugee communities, including Middle-Eastern, Southeast Asian, and Hispanic communities.

18.     Pars provides programs and services to communities affected by the Proclamation, including, primarily, the Iranian community.  Pars' immigration services include assisting individuals with a range of immigration processes, including citizenship/naturalization applications, green card applications and renewals, domestic violence-based immigration petitions, family-based petitions, I-730 Refugee/Asylee petitions, travel documents, National Visa Center processing, employment authorization applications, requests for fee waivers, and representation at USCIS interviews.  Pars' work also encompasses assisting individuals with more complex immigration relief such as humanitarian reinstatements and, notably, waivers under Section 3(c) of the Proclamation.

19.     In addition, Pars offers education and outreach services including in-house and mobile workshops, seminars, and roundtable discussions on immigrant rights issues such as immigration arrests and detentions, and rights at the border.

20.     Pars provides social services to its clientele and the broader community, including but not limited to English as a Second Language (ESL) instruction, citizenship classes, computer training and access to employment resources such as job fairs, assistance in navigating the U.S. social and medical systems, assistance with tax preparation, and cross-cultural and cross-generational support and training.

CLASS ACTION COMPLAINT - 5
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

21.    In 2017, Pars served close to 5,000 individuals through its social, legal, and education and outreach services.

22.    Plaintiff Pars asserts claims on behalf of itself and on behalf of its clients.

23.    Plaintiff OneAmerica is a 501(c)(3) non-profit membership organization with its principal place of business in Seattle, Washington. Plaintiff OneAmerica is the largest immigrant and refugee advocacy organization in Washington State.  OneAmerica envisions a peaceful world where every person's human rights and dignity are respected.  It seeks to achieve this vision by advancing fundamental principles of democracy and justice through organizing with and advocating for diverse communities.  At least one-third of OneAmerica's membership is Muslim, and many are nationals from the five Muslim-majority countries targeted by the Proclamation.

24.    OneAmerica was founded immediately after September 11, 2001 to address the backlash, hate crimes, and discrimination against immigrant communities of color, primarily Muslims, Arab Americans, East Africans, and South Asians.  OneAmerica plays an active and leading role in state and national coalitions working on immigrant rights, education, economic and environmental justice, voting rights, and immigrant integration.

25.    OneAmerica provides programs and services to immigrant communities affected by the Proclamation.  It conducts community education through regular community meetings and know your rights trainings on topics important to the community and that further its mission.  OneAmerica also produces publications to alert its membership to emerging issues and maintains an email listserv and social media accounts that reach over 25,000 individuals.

26.    OneAmerica asserts claims on its own behalf.

27.    Plaintiff Pamela Whitehall Raghebi is a native-born United States citizen who lives in Seattle, WA.  She has been married to her husband, Plaintiff Afshin Raghebi, an Iranian national, for over seven years, and has an approved I-130 Petition and an I-601A waiver for her husband to come and join her in the United States where they previously lived together for seven years.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

28.     Plaintiff Afshin Raghebi is an Iranian national who lived in the United States for 12 years and has been married to a U.S. citizen, Plaintiff Pamela Whitehall Raghebi, for over seven years.  Mr. Raghebi had been approved for a I-130 Petition and an I-601A waiver.  He is currently in Turkey, waiting for a consular officer at the Department of State to rule on his waiver so that he may return to his wife, their home in Seattle, and the business they run together.

29.     Plaintiff Zeinab Mohamed Hassan is a naturalized U.S. citizen of Somali origin who lives in Kent, Washington. She has approved I-130 petitions for her two adult daughters, who have been displaced from Somalia and currently reside in Kenya.

30.     Plaintiff Siraji Etha Siraji is a naturalized U.S. citizen of Somali origin living in SeaTac, Washington. He has an approved I-130 petition for his wife, a refugee displaced from Somalia who is living in Kenya with their three young U.S. citizen children. Plaintiff Siraji's wife is pregnant with their fourth child.

31.     Plaintiff Malayeen Ahmed is a U.S. citizen of Yemeni origin who lives in Santa Clara, California. She has an approved I-130 petition for her father, a Yemeni national, who has survived airstrikes on his home in Yemen and is now stranded in Djibouti following his consular interview.

32.     Plaintiff Reza Azimi is a U.S. citizen of Iranian origin who resides in Plymouth, Michigan. He sought to bring his parents, Iranian nationals, to the United States on tourist visas so that they could witness the birth of their first grandchild and provide temporary care and support to his wife and their newborn baby. Plaintiff Azimi's parents applied for visas in 2015 and 2017.

33.     Plaintiff Yahya Ghaleb is a U.S. citizen of Yemeni origin living in Dearborn, Michigan. He has an approved I-130 petition for his sixteen-year-old son, who is living in Yemen with his elderly grandmother.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

34.     Plaintiff Mitra Hannani is a national of Iran living in Kashan, Iran. She is the beneficiary of an approved I-130 petition filed by her U.S. citizen mother. Her mother, father, brother, and twin sister are all U.S. citizens and her only son is a Lawful Permanent Resident.

35.     Plaintiff Nicolas Hanout is a Lawful Permanent Resident of Syrian origin living in Castro Valley, California. He has an approved I-130 petition for his wife, who currently lives in Al Mouzeina, Homs Governorate, Syria.

36.     Plaintiff Hossein Zamani Hosseinabadi is an Iranian national pursuing a doctorate at Case Western Reserve University in Cleveland, Ohio on an F-1 student visa. He sought to bring his wife's parents, Iranian nationals, to the United States on tourist visas so that they could witness the birth of their first grandchild and provide temporary care and support to his wife and their newborn baby. Plaintiff Zamani Hosseinabadi's parents-in-law applied for non-immigrant tourist visas in 2017. Plaintiff Zamani Hosseinabadi's brother was selected for a visa through the diversity lottery program in 2017.

37.     Plaintiff Hoda Mehrabi Mohammadabadi, is a national of Iran living in Iran. She has an approved I-526 petition for a visa through the EB-5 program, which was originally created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. She has invested $500,000 in a hotel business in Milwaukee, Wisconsin, which is at risk of being lost.

38.     Plaintiff Maral Tabrizi is a Lawful Permanent Resident from Iran living in Tempe, Arizona. She sought to bring her parents, Iranian nationals, to the United States on tourist visas so that they could witness the birth of their first grandchild and provide temporary care and support to her and her newborn baby. Her parents applied for non-immigrant tourist visas in 2017.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

39.     Plaintiff John Doe #1[2] is a native-born U.S. citizen living in Marion County, Florida. He has an approved I-130 petition for his elderly parents, whose living situation in Libya has become increasingly dire as the country has become less stable.

40.     Plaintiff John Doe #2 is a U.S. citizen of Yemeni origin living in Dearborn, Michigan with his two U.S. citizen daughters, aged seven and eleven. He has an approved I-130 petition for his wife, a Yemeni national, who has been separated from John Doe #2 and their children since 2016.

41.     Plaintiff John Doe #3 is a native-born U.S. citizen who lives in San Francisco, California.  He has been engaged to his fiancée, an Iranian national and Plaintiff Jane Doe #1, for one year.  He has an approved I-129F petition permitting her to apply for a K-1 fiancée visa, which would allow her to come to the United States so they can marry.

42.     Plaintiff Jane Doe #1 is an Iranian national and the beneficiary of Plaintiff John Doe #3's approved I-129F petition.  She applied for a K-1 fiancée visa through the U.S. Embassy in Muscat, Oman.  After her consular interview, Plaintiff Jane Doe #1 received a notice denying her visa based on her ineligibility for a waiver.

43.     Defendant Mike Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamation, including the Proclamation's waiver provision, by all Department of State staff. He is sued in his official capacity.

44.     Defendant Kirstjen Nielsen is the Secretary of Homeland Security and has responsibility for overseeing enforcement and implementation of the Proclamation, including the Proclamation's waiver provision, by all Department of Homeland Security staff. She is sued in her official capacity.

45.     Defendant Kevin K. McAleenan is the Commissioner of the Customs and Border Protection and has responsibility for overseeing enforcement and implementation of the

---

[2] A motion for leave of Court for John Does #1-3 and Jane Doe #1 to proceed under pseudonyms is filed contemporaneously with this Complaint.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

Proclamation, including the Proclamation's waiver provision, by all Customs and Border Protection staff. He is sued in his official capacity.

46.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"). USCIS's responsibilities include adjudicating requests for immigration benefits for individuals located within the United States. CBP's responsibilities include inspecting and admitting immigrants and nonimmigrant arriving with U.S. visas at international points of entry, including airports and land borders. ICE's responsibilities include enforcing federal immigration law within the interior of the United States. The Proclamation assigns DHS a variety of responsibilities regarding its enforcement, including the implementation of the Proclamation's waiver provision.

47.     Defendant U.S. Department of State ("DOS") is a cabinet-level department of the United States federal government. DOS is responsible for the issuance of immigrant and nonimmigrant visas abroad. The Proclamation assigns DOS a variety of responsibilities regarding its enforcement, including the implementation of the Proclamation's waiver provision.

48.     Defendant Customs and Border Protection is a federal law enforcement agency within DHS. CBP's responsibilities include inspecting and admitting immigrants and nonimmigrant arriving with U.S. visas at international points of entry, including airports and land borders. The Proclamation assigns CBP a variety of responsibilities regarding its enforcement, including the implementation of the Proclamation's waiver provision.

## FACTUAL ALLEGATIONS

### President Trump's Attempts to Ban Muslims from the United States

49.     The plaintiffs in this lawsuit challenge the manner in which Defendants have implemented the waiver provision of the Proclamation (the "waiver process"), which represents

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

the latest of three attempts to effectuate President Trump's oft-repeated campaign promise to implement a "total and complete shutdown of Muslims entering the United States."

50.    The first attempt, EO-1, was signed one week after President Trump's inauguration. 82 Fed. Reg. 8977 (Jan. 27, 2017).

51.    EO-1 banned for 90 days the entry of any national from seven Muslim-majority countries, banned the entry of all refugees for 120 days, and indefinitely banned the entry of all Syrian refugees. It was rushed into effect so quickly that it blindsided not only key members of the Cabinet but also the agencies charged with its implementation, causing chaos at airports across the nation and confusion among the ranks of U.S. Custom and Border Protection, the Department of Homeland Security, and the Department of State.

52.    Although EO-1 was soon enjoined after it was issued, President Trump was undeterred. On March 6, 2017, he signed EO-2, which was extremely similar to EO-1 in most material respects and, according to Trump Administration officials, was intended to achieve the same policy outcomes as EO-1. After facing further successful legal challenges to EO-2, President Trump replaced it with the Proclamation on September 24, 2017.

### The September 24, 2017 Presidential Proclamation

53.    The Proclamation, which went into effect on or around December 8, 2017, states that all nationals seeking entry as immigrants from five Muslim-majority countries (Iran, Libya, Somalia, Syria, and Yemen) are banned indefinitely.

54.    The Proclamation likewise indefinitely bans non-immigrant entry for most nationals from these countries, either by banning non-immigrant entry entirely (Syria), banning entry based on the most commonly used non-immigrant visas for nationals from the affected countries (Iran, Libya, Yemen), or subjecting non-immigrant visas applicants to "additional scrutiny" (Somalia).[3]

---

[3] The Proclamation initially included Chad and banned nationals of Chad from seeking entry as immigrants, as well as entry based on the types of non-immigrant visas most commonly sought by nationals of Chad. On April 10, 2018, fifteen days before the Supreme Court of the United States heard oral arguments on constitutional and statutory challenges to the Proclamation in *Trump v. Hawai'i*, President Trump issued a new Presidential

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

55.     The Proclamation also bans certain Venezuelan government officials and their immediate relatives who seek to enter the United States on non-immigrant visitor and business visas. Estimates suggest that at most a few hundred Venezuelans will be affected by EO-3 each year.

56.     Similarly, the Proclamation categorically bans all nationals of North Korea from entering the United States. The number of entries to the United States by North Korea has been so historically low that fewer than 100 visa applicants on average will be affected by the Proclamation per year.

57.     The impact of the Proclamation thus falls almost entirely on Muslims. For example, if it had been in effect in 2016, the Proclamation would have denied immigrant visas to 12,998 Yemenis, 7,727 Iranians, 9 North Koreans, and 0 Venezuelans.

58.     Before it could go into effect, the Proclamation was enjoined by two district courts on the grounds that it violated the Establishment Clause and the INA. *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 633 (D. Md. 2017), *aff'd* 833 F.3d 233 (4th Cir. 2018), *vacated* 2018 WL 1256938; *Hawai'i v. Trump*, 265 F. Supp. 3d 1140, 1155 (D. Hawai'i 2017), *aff'd* 878 F.3d 662 (9th Cir. 2017), *rev'd* 138 S.Ct. 2392 (2018).

59.     The government subsequently petitioned the Supreme Court for a stay of the injunctions during the pendency of the government's appeals of the injunctions to the Fourth and Ninth Circuit Courts of Appeals. The Supreme Court granted the government's application for a stay on December 4, 2017.

60.     The Proclamation went into effect on or around December 8, 2017, and has remained in effect since.

---

Proclamation removing the visa restrictions imposed on nationals of Chad. *Presidential Proclamation Maintaining Enhanced Vetting Capabilities and Processes for Detected Attempted Entry into the United states by Terrorists or Other Public-Safety Threats*, (April. 10, 2018), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-maintaining-enhanced-vetting-capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats/.

CLASS ACTION COMPLAINT - 12
NO.

The Proclamation's Waiver Provision

61.    Like its predecessors, the Proclamation allows for waivers to its entry bans on a case-by-case basis. Proclamation § 3(c).

62.    The Proclamation's waiver provision states that a foreign national may be granted a waiver if she satisfies three criteria: first, that "denying entry" would cause her "undue hardship;" second, that her "entry would not pose a threat to the national security or public safety of the United States;" and third, that her "entry would be in the national interest." Proclamation § 3(c)(i).

63.    The visa applicant has the burden of "demonstrat[ing] to the consular officer's or CBP official's satisfaction" that the applicant meets each of the three criteria set out in Section 3(c)(i).

64.    The Proclamation also provides nine examples of circumstances in which a waiver might be appropriate, "such as" when a visa applicant "seeks to enter the United States to visit or reside with a close family member . . . who is a United States citizen;" "seeks to reenter the United States to resume" long-term work or study; "has previously established significant contacts with the United States;" or "is an infant, a young child or adoptee" or "an individual needing urgent medical care." Proclamation § 3(c)(iv)(A)-(J).

65.    The waiver provision gives discretion to grant waivers specifically to consular officers, the Commissioner of Customs and Border Protection, or a "designee" of the CBP Commissioner. It further states that "a waiver may be granted *only* if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that" the foreign national meets the three eligibility criteria (emphasis added).

66.    In addition, the Proclamation states that "[t]he Secretary of State and the Secretary of Homeland Security *shall* coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants." Proclamation § 3(c)(ii) (emphasis added).

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

67.     Section 3(c)(ii) of the Proclamation states that this required guidance "*shall* address the standards, policies, and procedures" for five specific agency actions:

> A) "determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States;"

> B) "determining whether the entry of a foreign national would be in the national interest;"

> C) "addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to the restrictions and limitations imposed by this proclamation;"

> D) "assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy the requirements" set out in the Proclamation for waiver eligibility; and

> E) "determining the special circumstances that would justify granting a waiver" as outlined in by the Proclamation in Section 3(c)(iv)(A)-(J). Proclamation § 3(c)(ii)(A)-(E) (emphasis added).

68.     The Proclamation does not require the Secretary of State or the Secretary of Homeland Security to keep the guidance ordered by Section 3(c)(ii) secret or non-public.

69.     To the extent such guidance ordered by Section 3(c)(ii) has in fact been promulgated, it has not been made public, nor did the agencies adopt such guidance through notice and comment.

70.     The government has not made public the guidance that the Proclamation directed the Secretaries of State and Homeland Security to adopt "addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants." Proclamation § 3(c)(ii).

CLASS ACTION COMPLAINT - 14
NO.

71.     Shortly after the Proclamation went into effect, the State Department published a set of "Frequently Asked Questions" ("FAQs") on its website in which it confirmed, "There is no separate application for a waiver." *December 4, 2017 – Court Order on Presidential Proclamation*, UNITED STATES DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/presidential-proclamation-archive/2017-12-04-Presidential-Proclamation.html.

72.     The FAQs, which mostly refer back to the text of the Proclamation itself, further advised that any "individual who seeks to travel to the United States should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver."

73.     The FAQs, however, provide no guidance about what kind of "information" the applicant should disclose to demonstrate the applicant's eligibility for a waiver.

74.     Nor do the FAQs provide any guidance for individuals whose visa interview had already taken place before the Proclamation went into effect, who had no opportunity to "disclose during the visa interview" any waiver-related information.

### The State Department Letters

75.     Apart from the text of the Proclamation itself and the sparse FAQs on the State Department website, the primary source of information about Defendants' implementation of the waiver provision comes from two letters that the State Department sent in February and June 2018, in response to inquiries from Senator Chris Van Hollen about the Proclamation and how the waiver provision was being implemented.[4]  *See* Exhibits B and C.

76.     Although the Department of State did not make these letters publicly available, their contents have since been made public via news articles published by Reuters.  Yeganeh Torbati, Mica Rosenberg, *Exclusive: Visa waivers rarely granted under Trump's latest U.S.*

---

[4] Because there is so little publicly available information about the waiver process, multiple civil rights organizations, including some of the undersigned counsel, have filed FOIA requests seeking documents from the State Department regarding the manner in which Defendants have implemented the Proclamation's waiver provision. The State Department has not yet complied with any of these requests.

CLASS ACTION COMPLAINT - 15
NO.

*travel ban: data*, Reuters (Mar. 6, 2018), https://www.reuters.com/article/us-usa-immigration-travelban-exclusive/exclusive-visa-waivers-rarely-granted-under-trumps-latest-u-s-travel-ban-data-idUSKCN1GI2DW. (discussing Feb. 2018 letter); Yeganeh Torbati, *U.S. issued waivers to Trump's travel ban at rate of 2 percent, data shows*, Reuters (June 26, 2018), https://www.reuters.com/article/us-usa-immigration-ban/us-issued-waivers-to-trumps-travel-ban-at-rate-of-2-percent-data-shows-idUSKBN1JN07T. (discussing June 2018 letter).

77.     In the first letter, sent on February 22, 2018 (the "February 22 letter"), the State Department stated that as of February 15, 2018, only two waivers had been granted, while over 8,400 had been denied. *See* Exhibit B.

78.     According to the February 22 letter, "[i]f an applicant from one of the designated countries is determined to be otherwise eligible for a visa under the INA, the interviewing officer must then determine whether the applicant falls into one of the exceptions to the Proclamation."[5] If such an applicant does *not* fall within one of the exceptions, the consular officer then considers the applicant for a waiver.

79.     The February 22 letter stated that when considering an applicant for a waiver, "[c]onsular officers may grant waivers on a case-by-case basis when the applicant demonstrates to the officer's satisfaction that he or she meets the three criteria" set out in Section 3(c) of the Proclamation: "(1) denying entry would cause the foreign national undue hardship; (2) entry would not pose a threat to the national security or public safety of the United States; and (3) entry would be in the national interest."

80.     The manner in which Defendants have implemented the waiver provision, however, requires that a visa applicant meet a significantly higher standard of proof of eligibility than the criteria set forth in the text of the Proclamation.

---

[5] The Proclamation expressly excepts, and states that its suspensions on entry shall not apply to, among others, lawful permanent residents; dual nationals traveling on a passport issued by a non-banned country; foreign nationals traveling on diplomatic visas; foreign nationals who have been granted asylum; admitted refugees; and certain other narrow categories of foreign nationals. Proclamation § 3(b).

CLASS ACTION COMPLAINT - 16
NO.

LANE POWELL pc
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

81.     For example, the Proclamation states that a visa applicant may be granted a waiver if, among other things, the applicant can demonstrate to a consular officer's satisfaction that "denying entry would cause undue hardship." The February 22 letter, however, states that to satisfy the "undue hardship" criterion, an applicant "must demonstrate to the consular officer's satisfaction that an *unusual* situation exists that *compels immediate travel* by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel." (emphasis added).

82.     The February 22 letter does not explain why "undue hardship"—a standard undefined in any immigration statutes or regulations relevant to waivers—is tied to a necessity for "immediate travel." Nor does the February 22 letter explain how an applicant unaware of the February 22 letter would have any notice or understanding that this criterion requires a showing of an "unusual situation that compels immediate travel."

83.     Similarly, the Proclamation states that to qualify for a waiver, a visa applicant must demonstrate that "entry would not pose a threat to the national security or public safety of the United States." In contrast, the February 22 letter states specifically that for an applicant to meet this criterion, a consular officer must "consider[] the information-sharing and identity-management protocols and practices of the government of the applicant's country of nationality as they relate to the applicant." The consular officer may only issue a visa "with the concurrence of a consular manager" if the consular officer determines, "after consultation with the Visa Office, that an applicant does not pose a threat to national security or public safety and the other two requirements have been met."

84.     The February 22 letter does not provide further guidance on how a visa applicant can satisfy the burden of proof for this criterion when it is incumbent on the *consular officer*, independent of whatever documentation or information the applicant may proffer, to consider the information-sharing and identity-management protocols and practices of the applicant's country of nationality. Nor does the February 22 letter provide guidance on how a visa applicant

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

can satisfy the burden of proof for this criterion when the Proclamation has already decreed that the information-sharing policies of all countries listed in the Proclamation are deficient.

85.     The February 22 letter likewise fails to explain how an applicant has any way of knowing how her country's information-sharing and identity-management protocols and practices relate specifically to her, in order to demonstrate that she poses no threat to U.S. national security or public safety.

86.     In addition, the February 22 letter does not explain how a consular officer may meaningfully exercise any discretion in deciding whether to grant or deny a waiver when the consular officer must consult with the Visa Office and a consular manager to determine whether the visa applicant has met all three eligibility criteria for a waiver.

87.     With respect to the third criterion, the Proclamation states that a visa applicant must demonstrate that his or her "entry would be in the national interest." The February 22 letter, however, reveals that, to meet the "national interest" criteria, the applicant must "demonstrate[] to the consular officer's satisfaction that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted."

88.     The February 22 letter does not explain how a visa applicant can satisfy the burden of proof for this criterion when no individual visa applicant has any way of knowing when the U.S. government will decide to lift visa restrictions on nationals of her country.

89.     In addition to defining more stringent waiver criteria than the Proclamation itself, the February 22 letter describes a more restrictive view of the exemplar circumstances under which the Proclamation states that waivers may be appropriate.

90.     The February 22 letter cites Section 3(c)(iv) of the Proclamation as providing "examples of the circumstances in which a waiver might be appropriate," and states that "consular officers may consult with the Visa Office if a consular officer believes a case may warrant a waiver but the applicant's circumstances do not align with one of the examples in the Proclamation."

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

91.     The Proclamation, however, makes clear that the examples it provides are not intended to be exhaustive. Proclamation § 3(c)(iv) ("Case-by-case waivers . . . may be appropriate . . . in individual circumstances *such as the following* . . ." (emphasis added)).

92.     There is no public information available indicating that Defendants have provided guidance to consular officers making clear that a visa applicant need not specifically align with one of the examples in the Proclamation to be eligible for a waiver.

93.     There is no public information available indicating that Defendants have provided any guidance to consular officers on what specific circumstances might warrant a consular officer's consultation with the Visa Office.

94.     Like the State Department's on-line FAQs, the February 22 letter confirms that "[t]here is no waiver form to be completed by the applicant."

95.     The February 22 letter, however, does not provide guidance on how visa applicants can satisfy the burden of proof under the Proclamation when the visa application materials they submit do not specifically address the waiver criteria and applicants are not otherwise given an opportunity to provide information to the State Department to demonstrate their eligibility for a waiver.

96.     Nor does the February 22 letter explain how consular officers are expected to make rational and informed decisions on an applicant's eligibility for a waiver when the visa application materials they consider do not solicit information regarding the waiver criteria and no systematized and orderly process to receive evidence of applicants' eligibility for a waiver has been established.

97.     On April 19, 2018, Senator Van Hollen and other senators requested further information on the implementation of the waiver provision from the Departments of State and Homeland Security. The Department of State responded via letter on June 22, 2018 (the "June 22 letter"). *See* Exhibit C.

98.     The June 22 letter repeated that "the [State] Department's worldwide guidance to consular officers regarding when a waiver pursuant to section 3(c) of PP [Presidential

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

Proclamation] 9645 may be granted is drawn directly from PP 9645 itself." It also stated that the State Department's "internal operational guidance is intended for consular officer's [sic] internal use only and is not publicly available."

### The Implementation of the Waiver Provision

99.      The lack of information provided either in the Proclamation or in subsequent government statements about how waivers will be granted has resulted in a waiver process that is opaque, confusing, arbitrary, and untethered to the Proclamation itself, to say nothing of existing immigration laws and regulations.

100.     Indeed, the implementation of the Proclamation's waiver provision appears to have been rushed and chaotic, and in many instances, violated the terms of the Proclamation itself.

101.     Upon information and belief, hundreds, if not thousands, of denials[6] of waivers were issued via standardized form letters in the first month after the Proclamation went into effect on or around December 8, 2017.

102.     These mass waiver denials appear to have been sent without regard to the status of any particular individual's visa application. Denials were sent to individuals who had already completed their consular interviews; to individuals who had scheduled but had not yet appeared for their consular interviews; and to individuals who had not yet been offered consular interviews.

103.     None of these individuals who received waiver denials were given notice of the availability of a waiver or an opportunity to demonstrate their eligibility for such a waiver.

104.     The mass form denials extended even to individuals, such as Plaintiff Yahya Ghaleb's son, who had previously received verbal or written notice that their visa applications

---

[6] Because communications from the consulate to visa applicants, including application status information provided on-line via the U.S. Department of State Consular Electronic Application Center ("CEAC"), have used inconsistent terminology, any references to "denials" and decisions to "deny" waivers in this complaint also encompass "refusals" and decisions to "refuse" waivers.

CLASS ACTION COMPLAINT - 20
NO.

had been approved and who had been instructed to leave their passports with the relevant embassy so that their visas could be printed and embossed into their passports.

105.    To add to the lack of clarity surrounding the waiver process, at least some of these individuals who received mass form denials from the U.S. Embassy in Djibouti in the early days of the waiver provision's implementation have more recently received email communications from the consulate indicating that their waiver eligibility was being "reconsidered."

106.    In the weeks and months following the initial implementation of the waiver provision, the waiver process has become no less opaque and confusing to affected individuals with pending visa applications.

107.    The FAQs published by the State Department, for example, advise that visa applicants should "disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver."

108.    For most, if not all, visa applicants from the banned countries, the consular interview represents the only opportunity to present evidence supporting their eligibility for a waiver. This is because currently available visa applications do not expressly ask applicants to provide information relevant to the Proclamation's three separate criteria for waiver eligibility, and because the government has declined to establish an application or other procedure by which visa applicants can request waivers and demonstrate that they satisfy the criteria.

109.    When the Proclamation went into effect, thousands of pending visa applicants had already completed their consular interviews.

110.    Many of these individuals were denied a waiver and a visa without ever having been given notice of the availability of a waiver, and without having been given the opportunity, either through a second consular interview or otherwise, to demonstrate their eligibility for a waiver.

111.    Likewise, when the Proclamation went into effect, thousands of pending visa applicants were waiting to schedule their consular interviews.

CLASS ACTION COMPLAINT - 21
NO.

112.    Many of these individuals were denied a waiver and a visa without ever having been given notice of the availability of a waiver, and without having been given the opportunity, either through a consular interview or otherwise, to demonstrate their eligibility for such a waiver.

113.    The denials of waivers and visas without providing any notice of the availability of a waiver contravenes 22 C.F.R. §§ 41.121 and 42.81, which state that when refusing the issuance of a visa, a consular officer must inform the visa applicant "whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal." 22 C.F.R. § 41.121.

114.    Those visa applicants who have been allowed to schedule and attend their consular interviews after the Proclamation went into effect have struggled to navigate the waiver process, hampered by the lack of information about waivers and how to demonstrate eligibility for them.

115.    When applying for most other waivers of other statutory grounds of inadmissibility under the INA, applicants can go to the U.S. Citizenship and Immigration Service ("USCIS") website (www.uscis.gov), search for the specific type of waiver they seek, obtain the application form that is specific to that waiver, and find instructions for how to complete the application form.

116.    For all other available waivers of inadmissibility under the INA, the USCIS website also provides details about what additional documentation is necessary to support a waiver application; a mailing address to submit the completed form and any supporting documentation; information about any filing fees associated with the application; the current approximate processing time for adjudication of that specific type of waiver; and information about the specific process available for appealing the decision.

117.    Defendants have provided no such information or application forms for individuals seeking waivers under the Proclamation.

118.    Indeed, although the DOS FAQ's advise visa applicants to "disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver,"

some consulates, when providing written notice to visa applicants of what they should bring to their consular interviews, have omitted any mention of bringing materials that might support waiver eligibility.

119.    For many visa applicants and immigration attorneys, trying to gather information about the waiver process available under the Proclamation has been a matter of piecing together word-of-mouth anecdotes from others entangled in the same process, and attempting to extrapolate information about the process from the varying treatment of waiver cases in different postures within and across different consulates.

120.    Indeed, some immigration attorneys have struggled with whether to advise clients even to schedule and appear for an interview, given that these attorneys are aware that so few waivers have actually been granted, and given that traveling to a consulate and paying the requisite fees for an interview are costly for visa applicants. The travel itself can also be dangerous, going through conflict zones.

121.    Many visa applicants who decide to incur the cost of attending a consular interview have assembled packets of information and documentation ("waiver packets") to offer to the consular officer at their consular interview, and have prepared to answer questions during the interview, to show how they meet each of the three criteria for a waiver. Preparing a packet is time consuming and often costly, especially if the visa applicant and their family have retained an attorney to assist with the visa application and waiver process.

122.    However, notwithstanding the State Department's directive to visa applicants to "disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver," consular officers have not necessarily allowed interviewees to make such disclosures during their consular interviews.

123.    Visa applicants appearing for consular interviews at different consulates, including those in Abu Dhabi, United Arab Emirates; Addis Ababa, Ethiopia; Amman, Jordan; Ankara, Turkey; Cairo, Egypt; Casablanca, Morocco; Djibouti City, Djibouti; Dubai, United Arab Emirates; Kuala Lumpur, Malaysia; Muscat, Oman; Nairobi, Kenya; and Yerevan,

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Armenia, have encountered a range of responses that have varied from consulate to consulate, and even from consular officer to consular officer within the same consulate.

124.    Treatment of waiver packets has differed among consular officers and across consulates, time periods, and applicants: officers have accepted proffered waiver packets; refused proffered waiver packets; accepted some but not all documents from proffered waiver packets; or accepted verbal information but declined anything in writing. Some officers have even berated interviewees for "wasting" their money on preparing a packet while simultaneously refusing to accept or look at the packet.

125.    Indeed, some consular posts have begun informing immigration attorneys that there is "no role for legal services to facilitate the waiver process" and that "only U.S. government officials can author waiver requests."

126.    Similarly, consular officers' treatment of questions of waiver eligibility during consular interviews has differed among consular officers and across consulates, time periods, and applicants: officers have conducted the interview and asked questions relating to waiver eligibility; conducted the interview and refrained from asking questions relating to waiver eligibility; conducted the interview but nevertheless gave the visa applicant a form letter denying a waiver; refused to conduct the interview on the grounds that the officer could not grant any visas under the Proclamation; or refused to conduct the interview and simply handed the visa applicant a form letter denying a waiver.

127.    Many of the individuals who were allowed to attend their consular interviews after the Proclamation went into effect were given a boilerplate letter at the end of the interview, notifying them that they had been denied a waiver and a visa.

128.    The denial letters, which are usually presented in both English and the native language of the applicant, vary wildly both in the English and the translated versions, which has caused confusion. The denial notice that the U.S. Embassy in Addis Ababa provided to Somalis, for example, is one sentence long and informs the visa applicant that "no pardon" can be given to her case. The denial notice provided by the U.S. Embassy in Yerevan is lengthier

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

and appears to translate more faithfully the English-language version. Some denial forms provide information about how to reapply for a visa, while others do not.

129.    The denial of waivers for individuals has caused widespread consternation and confusion because none of the communications from the consulates indicate whether a denied individual's underlying visa petition or application has also been denied. It is unclear whether someone with an approved I-130 petition, for example, must now resubmit that petition—a process that for some individuals can take years or even decades.

130.    This lack of clarity extends even to whether a waiver has been denied. Many individuals who have checked the status of their pending applications and petitions online through the U.S. Department of State Consular Electronic Application Center ("CEAC") have observed that their case status indicated "refused," without any indication as to what has been "refused"—their waiver or their visa application, or both—or whether they are being or have been considered for a waiver. Individuals in this situation do not know whether they can or should re-request a waiver, or when.

131.    Many individuals have also observed their CEAC case status change from "refused" to "administrative processing," or vice versa. The significance of these changes or their frequency is unclear and individuals in this situation do not know whether they need to reapply for a waiver or their visa, whether they are being considered for a waiver, or whether their case will remain indefinitely pending in administrative processing.  Indeed, many have been waiting months in administrative processing.

132.    The Defendants' indefinite delay in deciding whether to grant or deny a waiver and visa by placing cases in administrative processing contravenes agency policy.  *See* Public Law 107-228, sec. 233 (Sept. 30, 2002) ("It *shall* be the policy of the Department of State to process immigrant visa applications of immediate relatives of United States citizens and nonimmigrant K-1 visa applications of fiancés of United States citizens *within 30 days of the receipt of all necessary documents from the applicant and [USCIS]*. In the case of an immigrant visa application where the sponsor of such applicant is a relative other than an immediate

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

relative, it should be the policy of the Department of State to process such an application within 60 days of the receipt of all necessary documents from the applicant and [USCIS]") (emphasis added).

133.    During the time the Proclamation and its waiver provision have been in effect, numerous individuals have been denied waivers despite presenting one or more of the exemplar circumstances that the Proclamation states may warrant a waiver.

134.    During the time the Proclamation and its waiver provision have been in effect, minor children have been unable to reunite with their parents, grandparents have missed the births and subsequent birthdays of grandchildren, siblings have been kept apart, adult children have been unable to care for their elderly parents, spouses as well as engaged couples have been forced to put their future plans on indefinite hold, and patients with medical needs have been prevented from seeking care in this country because individuals abroad have been unable to obtain waivers.

135.    During the time the Proclamation and its waiver provision have been in effect, the uncertainty caused by the waiver process has caused significant physical, financial, and emotional distress on Plaintiffs and other similarly situated individuals whose only hope for family reunification is a waiver. The stress has caused at least one husband and father, whose wife and children were refused visas under the Proclamation and were stranded in Djibouti waiting for waivers, to die by suicide.  Mallory Moench, *U.S. citizen's family was denied visas under Trump's travel ban.  Then he died by suicide,* NBC NEWS (July 28, 2018), https://www.nbcnews.com/news/us-news/u-s-citizen-s-family-was-denied-visas-under-trump-n895381.

### Evidence that the Waiver Process Is Window Dressing

136.    Despite the lack of transparency surrounding the waiver process, one conclusion is clear: that only an exceedingly small number of visa applicants are actually granted waivers.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

137.    Indeed, at the April 25, 2018 oral arguments before the Supreme Court in *Trump v. Hawai'i*, Justices Breyer and Sotomayor specifically asked about the waiver process and whether "it is, in fact, a real waiver process," as opposed to mere "window dressing."

138.    The statistics that the government has made publicly available about the waiver process confirm that it is, indeed, window dressing.

139.    The February 22 letter sent to Senator Van Hollen provided the earliest and first publicly available statistics about the waiver process. *See* Exhibit B.

140.    On a separate page entitled, "Visa Applications Received and Processed from Nationals Subject to Presidential Proclamation 9645 (From December 8, 2017 to January 8, 2018)," the February 22 letter provided the following figures:

| | |
|---|---|
| Applications for nonimmigrant and immigrant visas: | 8,406 |
| Applicants refused for reasons unrelated to the Proclamation: | 1,723 |
| Applicants qualifying for an exception: | 128 |
| Applicants who failed to meet the criteria for a waiver[:] | 6,282 |
| Applications refused under the Proclamation with waiver consideration: | 271 |
| Waivers approved (as of February 15): | 2 |

141.    Based on these numbers, only 0.02% of visa applicants from banned countries had been granted waivers as of February 15, 2018.

142.    The Reuters article that had initially made the February 22 letter public, dated March 6, 2018, provided further information. It stated that since February 15, 2018, the State Department had granted more than 100 additional waivers.

143.    The Reuters article added, however, that it was not clear how many of those additional waivers had been granted to the approximately 8,400 individuals who had sought waivers in the first month the Proclamation had been in effect.

144.    Nor did the Reuters article disclose how many thousands of additional visa applications had been processed and considered for waiver eligibility between February 15, 2018 and March 6, 2018.

CLASS ACTION COMPLAINT - 27
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

145.    As briefing progressed and oral argument approached in *Trump v. Hawai'i*, the government not only appeared to start granting waivers at a relatively faster rate, but also began publicly providing information on the numbers of waivers granted.

146.    On or around April 13, 2018, the State Department published new FAQs about the waiver process that included the statement that "[f]rom December 8, 2017 through April 1, 2018, more than 430 applicants were cleared for waivers after a consular officer determined the applicants satisfied all criteria and completed all required processing."

147.    The government repeated this figure in reply briefing submitted to the Supreme Court in *Trump v. Hawai'i* on April 18, 2018, stating that "more than 430 individuals" had been granted waivers. In oral argument before the Supreme Court on April 25, 2018, the United States Solicitor General confirmed that 430 waivers had been granted.

148.    The June 22 letter sent to Senator Van Hollen subsequently indicated that statistics on the number of waivers granted "is updated every two weeks." *See* Exhibit C.

149.    On a separate page entitled, "Visa Applications Received and Processed from Nationals Subject to Presidential Proclamation 9645 (As of April 20 unless otherwise stated)," the June 22 letter provided the following figures:

Number of NIV and IV applications from impacted nationalities who
    applied for visas in the P.P. 9645 covered categories:                      33,176
Number of applicants found ineligible for reasons other than those
    covered in P.P. 9645 (e.g. INA 214(b) so a review for eligibility under
    P.P. 9645 was not required:                                  4,900
Number of applicants who received a visa under an exception from
    P.P. 9645:                                            1,147
Number of applicants cleared for waivers:           579 (768 as of May 31)
Number of applicants interviewed, but still awaiting a determination
    on a waiver:                                       4,157

150.    Based on the DOS figures provided in the June 22 letter, less than 2% of visa applicants from banned countries had been granted waivers as of April 30, 2018.

151.    The most recent update to the State Department FAQs indicates that that "996 applicants were cleared for waivers after a consular officer determined the applicants satisfied

all criteria and completed all required processing" between December 8, 2017 and July 15, 2018.

152.    With the exception of the two letters sent to Senator Van Hollen, none of the figures that the government has provided on the number of waivers granted, including the figure updated every two weeks on the State Department website, has included information about how many visa applicants have been denied a waiver, how many visa applicants have been considered for a waiver, or how many visa applications in total have been processed.

153.    In addition, as the June 22 letter clarified, the fact that an individual has been "cleared for" a waiver does not mean that the individual has been granted a waiver or received a visa. No information is available as to how many individuals have received visas after being cleared for a waiver.

154.    Beyond the available statistics, additional evidence indicates that the waiver process is merely "window dressing."

155.    For example, a sworn declaration from Christopher Richardson (the "Richardson declaration"), who had worked as the Americans Citizens Service Chief in Madrid until he resigned from the State Department in March 2018, indicates that consular officers considering visa applicants for waiver are "to determine at all possible cost that the person was not eligible to even apply for a waiver." *See* Exhibit A.

156.    The Richardson declaration states that "[i]f for some reason" a consular officer "had no choice but to determine we could find an applicant eligible to apply," the consular officer was prohibited from exercising any discretion in granting a waiver, "regardless of the [Presidential Proclamation] instructions that we had 'discretion to grant the waiver.'" Rather, consular officers "were mandated to send to Washington that we found this applicant eligible to apply and Washington would then make the decision to grant or deny the waiver."

157.    The Richardson declaration further states that none of the "guidance cables, sample Q's and A's and instructions" regarding the implementation of the waiver process were actually classified, but that it is understandable why the government would not want to make

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

such materials public: "when read together with our training, it is understood that there really is no waiver [process] and the Supreme Court was correct to point out that the waiver [process] is merely 'window dressing.'"

158.    Mr. Richardson further observed that "[i]n essence what the administration was doing was 'hiding' behind the doctrine of consular non-reviewability for the benefit of issuing a Muslim ban and the same time usurping all of our authority given by both Congress and the P[residential] P[roclamation] by disallowing the consular officer to make a decision."

159.    The waiver process, as described by Mr. Richardson, directly contravenes 8 U.S.C. §1104(a), which states that consular officers have complete discretion over the issuance of visas and that such discretion may not be circumscribed by the Secretary of State.

160.    A second consular officer has likewise stated that the material issued by the State Department regarding the waiver process "would demonstrate that the waiver process has 'no rational basis.'" Jeremy Stahl, *The Waiver Process Is Fraud,* SLATE (June 15, 2018), https://slate.com/news-and-politics/2018/06/trump-travel-ban-waiver-process-is-a-sham-two-consular-officers-say.html.

161.    This second consular officer has stated that the Proclamation has "usurped" the authority of consular officers, "yet make[s] it seem like we still have [authority] to decide." *Id.*

**The Harm Caused to Plaintiffs and their Clients and Members**

162.    Defendants' implementation of the Proclamation's waiver process has already caused Plaintiffs and their members and clients substantial, concrete, and particularized injury, in that it indefinitely prolongs the separation of close family members. The Proclamation's waiver provision, as currently implemented, threatens them with continued irreparable harm if not permanently enjoined.

163.    **Plaintiffs Pamela Whitehall Raghebi and Afshin Raghebi** have suffered and will continue to suffer harm because of the Proclamation and the waiver process.  Plaintiff Pamela Raghebi has an approved I-130 petition and an I-601A waiver for her husband.  Plaintiff

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

1  Afshin Raghebi is currently living in Turkey, awaiting a visa to return to his wife, business, and

2  home in the United States.

3      164.    Plaintiff Afshin Raghebi first moved to the United States in 2006.   An Iranian

4  national, he left Iran due to fear of persecution for his religious beliefs and is now afraid to

5  return to Iran.  Mr. Raghebi intended to, but never applied for asylum as he was fearful that

6  applying could eventually lead to his deportation.  In United States, he learned the trade of

7  windows and glass installation.  He met Mrs. Raghebi in Summer 2010 after he worked on the

8  windows at the senior living home where she worked as a receptionist.  Mr. and Mrs. Raghebi

9  were married a few months later in December 2010.  Together, Mr. and Mrs. Raghebi started a

10  glass and window installation business.  Mrs. Raghebi handled the accounting, while Mr.

11  Raghebi was the primary glass installer at the company.

12      165.    In January 2016, Mrs. Raghebi filed for an I-130 Petition to start the green card

13  process for Mr. Raghebi. They were approved for their I-130 Petition in April 2016, meaning

14  that USCIS had found that they had a bona fide relationship.  Because Mr. Raghebi had been

15  living in the U.S. undocumented, he had to file for an I-601A waiver of the 'unlawful presence'

16  grounds of inadmissibility.  To qualify for an I-601A waiver, Plaintiffs Mr. and Mrs. Raghebi

17  had to show that Mrs. Raghebi would suffer "extreme hardship" if her husband was not granted

18  permanent residency.  Mrs. Raghebi was able to make this showing, in part due to her health.

19  USCIS found that Mrs. Raghebi made this showing of "extreme hardship," and approved an I-

20  601A waiver for Mr. Raghebi in February 2017.

21      166.    Upon the approval of the 1-601A waiver, Mr. Raghebi left the United States on

22  March 12, 2018 as the I-601A waiver required him to leave the United States to be able to

23  complete the I-130 petition process.  However, Mr. Raghebi, despite having been granted the

24  I-601A waiver, has not been able to return to the United States due to the Proclamation.  When

25  Mr. Raghebi left the United States, he believed that he would be able to return under the waiver

26  process outlined in the Proclamation.

27

CLASS ACTION COMPLAINT - 31
NO.

167.    In March 2018, Mr. Raghebi had his green card interview with the U.S. embassy in Abu Dhabi. At that time, Mr. Raghebi attempted to present materials to demonstrate that his qualifications for a waiver of the travel ban. The consular officer did not ask to see these materials and did not ask Mr. Raghebi any questions related to his eligibility for a waiver. Mr. Raghebi was told he would learn whether he can return to the United States in two to three months. However, more than four months since his consular interview, Mr. Raghebi still has not received a determination on whether he will be granted a waiver under the Proclamation.

168.    Mr. Raghebi is currently living in Turkey, as it one of the few countries that does not require a visa for Iranian nationals. He is afraid to return to Iran, and wants to return to the United States to be with his wife of over seven years.

169.    The separation of these spouses has been emotionally devastating for each of them. They speak every day by telephone, and Mrs. Raghebi has traveled to Turkey to see her husband. Mrs. Raghebi suffers from a residual health condition that resulted from a severe bout of shingles, which causes her much pain, and the pain has been exacerbated by the stress caused by the separation from her husband. Mrs. Raghebi now takes anti-depressants to help her cope with the emotional toll of the separation. The separation has also caused financial hardship to the Raghebis, who own a window and glass installation business. Without Mr. Raghebi, who had performed much of the work of the business, the business's revenues are at one third of what they were when Mr. Raghebi was here in the United States. Without a waiver, these spouses of over seven years cannot be together, they suffer emotionally without each other, and the business they own together has significantly declined.

170.    **Plaintiff Zeinab Mohamed Hassan**, a U.S. citizen, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. Her two daughters are Somali refugees living in Kenya, and in 2013, when her daughters were both 18 years old, she submitted I-130 visa petitions to bring them to the safety of the United States.

171.    After their petitions were approved and their cases transferred from the National Visa Center to the United States Embassy in Nairobi, Kenya, Plaintiff Hassan's daughters

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

appeared for their consular interviews at the Embassy in Nairobi in October 2017. Because these interviews took place before the Proclamation went into effect, Plaintiff Hassan's daughters received no opportunity to present evidence of their eligibility for a waiver, much less notice that a waiver was even required for their entry to the United States. Their cases were subsequently put into administrative processing but they received no updates on their case for several months.

172.    In April 2018, an immigration attorney Plaintiff Hassan had retained explicitly requested that the Embassy consider Plaintiff Hassan's daughters for a waiver under the Proclamation. The Embassy responded that "[u]ntil the consular officer makes an individualized determination on these three factors, these applications will remain refused under Section 212(f)." After further pressure from the attorney, the Embassy stated that a consular officer was "currently reviewing their eligibility for a waiver" but that the Embassy could not provide any further information "until this process is completed."

173.    Plaintiff Hassan is devastated that the waiver process is prolonging the already protracted process of bringing her daughters to be with her in the United States. She has not seen them since 2016, and although she talks to them every night on the phone, she fears constantly for their safety and physical well-being because they are young, foreign-born women without a guardian in Kenya, where the government refuses to give Somali refugees the same protection as Kenyan nationals. Plaintiff Hassan's daughters are vulnerable either to being kidnapped and forced into marriage and/or raped by gangs, which operate with impunity throughout Kenya, or to being exploited by corrupt government officials seeking bribes from Somali refugees who fear being detained and removed to Somalia.

174.    Indeed, every time Plaintiff Hassan's daughters leave their apartment to buy food, they are accosted by police and must pay a bribe. Plaintiff Hassan constantly worries that the money she sends them each month is not enough to pay for their rent, food, and bribes. She fears that her daughters are not getting enough to eat and may be malnourished. But Plaintiff

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

1  Hassan is unable to send more money, and what she already sends places a significant financial

2  strain on her.

3      175.    Returning to Somalia, however, is not a realistic option for Plaintiff Hassan's

4  daughters; the country is politically unstable and the al-Qaeda-aligned terrorist group al-

5  Shabaab, which continues to battle the UN-backed government in Somalia, considers Somali

6  refugees returned from Kenya to be spies for the Kenyan security forces. If her daughters are

7  deported to Somalia, Plaintiff Hassan is certain that they will be assaulted and possibly killed.

8  Every day that her daughters remain in limbo in the waiver process, Plaintiff Hassan worries

9  that something terrible will happen to them before she can reunite with them in the United

10  States.

11      176.    **Plaintiff Siraji Etha Siraji**, a U.S. citizen, has suffered and will continue to

12  suffer harm because of the Proclamation and the waiver process. His wife, a refugee displaced

13  from her home country of Somalia for over a decade, is pregnant and currently living in Kenya

14  with their other three young children. Plaintiff Siraji filed an I-130 petition for his wife in 2013,

15  as well as Consular Reports of Birth Abroad ("CRBAs") to obtain United States passports for

16  his children.

17      177.    After Plaintiff Siraji's I-130 petition for his wife was approved in 2014, she

18  appeared for her consular interview at the United States Embassy in Kenya in February 2015.

19  The consular officer told her that her visa application was complete, but that it would be held

20  until the children's CRBAs were approved. However, it took almost two years longer, the

21  retention of an immigration attorney, and countless back-and-forth communications with the

22  U.S. Embassies in both Kenya and Uganda, where the children had been born, before the

23  Embassy in Uganda approved their CRBAs. The Embassy in Kenya then took almost another

24  year making various requests that Plaintiff Siraji's wife update her medical reports, her DS-260

25  Immigrant Visa Electronic Application, and other paperwork.

26      178.    On December 14, 2017, Plaintiff Siraji's wife appeared at the Embassy in Kenya

27  to swear that her DS-260 was correct. At that appointment, she was told that she would need a

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

waiver under the Proclamation. Although she asked if she could submit more information, she was told that the Embassy would contact her if any further information from her was needed. Plaintiff Siraji and his wife subsequently heard nothing until their attorney wrote the Embassy in Kenya for an update in April 2018. On April 19, 2018, the Embassy reported that the visa for Plaintiff Siraji's wife was "pending mandatory administrative process" and that "[t]he consular officer is currently reviewing her eligibility for a waiver."

179.    The separation from his wife and children has taken an emotional and financial toll on Plaintiff Siraji. Because his wife is a Somali refugee, she is constantly at risk of being arrested by Kenyan authorities and deported with the children to Somalia, where their lives would be at risk. The country is politically unstable, as al-Shabaab vies for control of the government, and much of the country is a conflict zone where kidnapping, assault, and murder are rampant. But remaining in Kenya is dangerous, because as Somali refugees, individuals like Plaintiff Siraji's family do not have the full protection of the government and have no legal guarantee that they can remain in Kenya indefinitely. This exposes them to corruption and abuse from exploitative government officials. Plaintiff Siraji worries constantly about the safety and well-being of his family. Because Plaintiff Siraji's wife cannot work in Kenya, Plaintiff Siraji must send money to support her and their children, which is a constant and significant drain on Plaintiff Siraji's resources.

180.    Plaintiff Siraji is desperate to bring his family to the United States so that they can be together in a place where his wife and children do not have to live in constant fear of being kidnapped, or becoming the victim of a criminal assault or terrorist act. He is frustrated that the waiver process is prolonging what was already a protracted process—and now the consulate will not even allow her to submit information about why she deserves a waiver. He does not understand how the consulate can sincerely consider for her a waiver when they have asked nothing about why she meets the eligibility criteria. And in the meantime, the waiver process continues to prevent his reunification with his family.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

181.    **Plaintiff Malayeen Ahmed**, a U.S. citizen, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. She has an approved I-130 petition for her father, who has survived airstrikes on his home in Yemen, and wishes to bring him to the safety of the United States.

182.    After two years of processing, Plaintiff Ahmed's father interviewed with the U.S. consulate in Djibouti in July 2017.   Because this interview took place before the Proclamation went into effect, Plaintiff Ahmed and her father had no opportunity to present evidence of his eligibility for a waiver. Plaintiff Ahmed's father has remained in Djibouti since his interview because it is too dangerous for him to return to Yemen, where his hometown continues to be shelled.

183.    On January 17, 2018, Plaintiff Ahmed's father received a letter from the U.S. embassy in Djibouti stating that he was ineligible for a visa pursuant to Presidential Proclamation 9645 and denied him a waiver.  Plaintiff Ahmed and her family were devastated. They have spent over $20,000 paying for fees, her father's travel expenses to get to Djibouti, and his living costs in Djibouti.

184.    Further communications with the consulate have only confused them. As recently as July 2018, the State Department indicated online that the visa application for Plaintiff Ahmad's father was actually pending in "administrative processing." That same month, the U.S. embassy in Djibouti sent plaintiff an "updated refusal letter" indicating that "a waiver is being reconsidered" in their case. But in the meantime, Plaintiff Ahmed received no information or instructions about how to request a waiver for her father. Plaintiff Ahmed emailed the consulate in late July documenting why her father's case merits a waiver. However, they did not receive any confirmation or further communication from the U.S. embassy  in Djibouti.

185.    The separation from her father has been physically, emotionally, and financially stressful for both Plaintiff Ahmed and her father. Although they speak every week on the phone, Plaintiff Ahmed's father has missed the births of all three of her children, which has been

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

devastating for Plaintiff Ahmed. She wept at the birth of her first son, born in June 2018 after two daughters, because her father could not be there to hold his first grandson. In addition, supporting her father in Djibouti has been a strain on the family's resources. Plaintiff Ahmed's husband often works 80 hours a week and overtime to support their family and to be able to send money to her father. Every day that her father's visa application remains on hold because of the waiver process exacts a financial and emotional cost on Plaintiff Ahmed and her family.

186.   **Plaintiff Reza Azimi**, a U.S. citizen, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. After Plaintiff Azimi's wife became pregnant with their first child, Plaintiff Azimi hoped his mother and father, both citizens of Iran, would be granted tourist visas, so that they could come to the United States for the birth of Plaintiff Azimi's first child and provide temporary care for his wife and newborn baby.

187.   In 2015, two years before Plaintiff Azimi's wife became pregnant, his mother and father had both applied for tourist visas and interviewed at the U.S. Consulate in Dubai, United Arab Emirates. Because this interview took place years before the Proclamation went into effect, Plaintiff Azimi's parents had no opportunity to present evidence of their eligibility for a waiver. Following the interview, Plaintiff Azimi's mother was granted a visa and later traveled to the United States to visit Plaintiff Azimi and his wife. His father's application, however, was placed in administrative processing, preventing him from making the trip to the United States with Plaintiff Azimi's mother.

188.   After learning of the impending birth of her new grandchild in 2017, Plaintiff Azimi's mother applied for another tourist visa in July 2017 to visit Plaintiff Azimi in the United States. She was granted an interview at the U.S. Consulate in Dubai in September 2017. Because her interview took place before the Proclamation went into effect, Plaintiff Azimi's mother had no opportunity to present evidence of her eligibility for a waiver, and indeed no notice of any waiver requirement. On January 3, 2018, however, Plaintiff Azimi's mother received a letter from the Nonimmigrant Visa Unit at the U.S. Consulate in Dubai informing her she had been found ineligible for a visa pursuant to Presidential Proclamation 9645 and that

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

she had been denied a waiver. A subsequent letter from the Embassy dated January 10, 2018 further explained that Plaintiff Azimi's mother's visa had initially been approved and was in administrative processing when the Embassy reversed its decision because of the Presidential Proclamation. The January 10 letter also stated she would not receive a waiver but was allowed to reapply for a visa.

189.    On February 19, 2018, after his 2015 visa application had been in administrative processing for over two years, Plaintiff Azimi's father received a letter similar to the January letter sent to Plaintiff Azimi's mother. The letter stated Plaintiff Azimi's father was ineligible for a visa under the Presidential Proclamation and denied a waiver. Plaintiff Azimi's father was never given the opportunity to submit information in support of a waiver.

190.    Plaintiff Azimi had hoped his parents would receive visas in time to see the birth of his first child and their first grandchild. In December 2017, however, while his parents were awaiting a decision on their visas, his wife gave birth. Plaintiff Azimi's parents are heartbroken they could not share that experience with Plaintiff Azimi and his wife, and now do not know if or when they will be able to see their grandchild.

191.    The separation from his parents has been difficult for Plaintiff Azimi and his wife. They have no other family in Michigan, and Plaintiff Azimi's job often requires him to work long hours. As first-time parents, Plaintiff Azimi and his wife were depending on Plaintiff Azimi's mother and father to assist them during the critical first months of their child's life. Now Plaintiff Azimi and his wife do not know if his parents will ever be able to come and provide support during the time in their child's life when they most need it. Plaintiff Azimi's wife worries that without any familial support, she will not be able to return to work. The situation has left Plaintiff and his wife anxious and grief-stricken. Without a waiver, Plaintiff Azimi's parents are prevented from helping his young family. Moreover, they are missing— and will never be able to reclaim—all the precious early moments of their grandchild's life.

192.    **Plaintiff Yahya Ghaleb**, a U.S. citizen, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. In June 2016, Plaintiff Ghaleb

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

applied for an immigrant visa for his sixteen-year-old son, who lives in Yemen with Plaintiff Ghaleb's elderly mother-in-law. As the civil war in Yemen has intensified and his mother-in-law's health has declined, Plaintiff Ghaleb began to worry about his son's safety and made plans to bring him to live with him in Michigan.

193.    Plaintiff Ghaleb's son was granted an interview at the U.S. Embassy in Djibouti on December 11, 2017. Although Plaintiff Ghaleb travelled from Michigan to meet his son in Djibouti and attended the interview with him, Plaintiff Ghaleb's son made the twenty-hour trip from Yemen to Djibouti alone. During the interview, the consular officers did not tell Plaintiff Ghaleb or his son about the availability of a waiver and made no inquiry into Plaintiff Ghaleb's son's eligibility for a waiver. As a result, neither Plaintiff Ghaleb nor his son presented evidence that might support the issuance of a waiver, as they were unaware of any such requirement for a waiver. At the interview's conclusion, a consular officer verbally informed and gave Plaintiff Ghaleb a letter stating that his son's visa application had been approved and that he now only had to wait for the visa to be processed and printed.

194.    On December 19, 2017, however, only a little more than a week after they received notice that his son's visa had been approved, Plaintiff Ghaleb received a second letter from the Embassy, stating that a consular officer had found his son ineligible for a visa pursuant to the Proclamation. The letter also stated a waiver would not be granted for his son.

195.    Subsequently, in July 2018, after months of believing his son had no opportunity to be granted a waiver, Plaintiff Ghaleb received yet another letter from the Embassy. This letter informed Plaintiff Ghaleb that the Embassy had again reversed its decision and was now reviewing his son's eligibility for a waiver, but that doing so could be a lengthy process. Online, the status of the visa petition for Plaintiff Ghaleb's son was changed to "administrative processing."

196.    The denial of Plaintiff Ghaleb's son's waiver and the Embassy's shifting and contradictory decisions about his son's visa application has caused Plaintiff Ghaleb significant stress and uncertainty. Plaintiff Ghaleb is overcome with anxiety and constantly worries about

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

1   his son's care and safety. The village where his son stays has faced missile strikes, not far from

2   the neighborhood where his son and his mother-in-law live. Plaintiff Ghaleb's mother-in-law

3   calls him frequently, worried her grandson will be killed if he remains in Yemen.

4        197.    Plaintiff Ghaleb has had difficulty concentrating and sleeping, as he imagines

5   his son stranded in a dangerous part of a war-torn country, thousands of miles from his only

6   parent. Because of the cost and time required to travel to Yemen, Plaintiff Ghaleb's contact

7   with his son has been infrequent. He has missed spending birthdays and holidays with his son

8   and has been unable to provide him with the parental support and instruction he needs. The

9   waiver process is now prolonging Plaintiff Ghaleb's separation from his son and he is afraid

10  something will happen to his son before he is able to come to the safety of the United States.

11       198.    **Plaintiff Mitra Hannani**, a national of Iran, has suffered and will continue to

12  suffer harm because of the Proclamation and the waiver process. Plaintiff Hannani is the

13  beneficiary of an approved I-130 petition filed by her mother, a U.S. citizen who resides in

14  Virginia. Plaintiff Hannani's parents and siblings are all U.S. citizens and her only son, 24 years

15  old, is a lawful permanent resident pursuing a graduate degree in podiatric medicine. Plaintiff

16  Mitra Hannani wishes to emigrate to the United States with her husband and seventeen-year-

17  old daughter so they can reunite with the rest of their family.

18       199.    After her mother's I-130 visa petition for her was approved, Plaintiff Hannani

19  and her family appeared for their consular interview at the United States Consulate in Abu

20  Dhabi, United Arab Emirates, in February 2017. Because their interview occurred before the

21  Proclamation into effect, they had no opportunity to present evidence of their eligibility for a

22  waiver, to say nothing of notice that providing such evidence might be necessary.

23       200.    Having heard nothing for months from the consulate regarding the status of her

24  visa application, Plaintiff Hannani e-mailed the consulate in Abu Dhabi in May 2018 to request

25  a waiver for herself and her family and attached a waiver packet outlining her and her family's

26  qualifications for a waiver. Approximately one month after sending this request, Plaintiff

27  Hannani received an email from the consulate, via her mother's immigration attorney, with a

request to complete the Form DS-5535, Supplemental Questions for Visa Applicants, which asks for, among other things, the applicant's travel, address, and employment history for the last fifteen years, and all e-mail addresses and social media handles used for the last five years. She provided responses promptly.

201.    Plaintiff Hannani has not otherwise received any affirmative communication from the consulate about the status of her family's visa applications or the waiver request she made in May 2018. For most of 2017 and 2018, the DOS website indicated that she and her husband were in "administrative processing," but that their seventeen-year-old daughter's case was "refused." In late July 2018, their daughter's status changed from "refused" to "administrative processing," but it remains unclear how long Plaintiff Hannani, her husband, and her daughter must wait before they receive a decision on their waivers and visa applications.

202.    Plaintiff Hannani is perplexed as to why her family's eligibility for a waiver is taking so long to process because they had previously been admitted to the United States in 2011 on non-immigrant visas. During a three-week trip, they visited their family and respected and observed all laws and immigration requirements of the United States.

203.    The separation from her family, which the waiver process is prolonging, is physically painful and emotionally distressing for Plaintiff Hannani. She has always had a deep connection with her twin sister and views her younger brother like a second son because she cared for him after their parents emigrated to the United States. She now sees them only rarely and being separated from her sister and family causes her grief, stress, and anxiety. Plaintiff Hannani is also concerned about the health of her parents, who are now in their 70s and 80s. When she speaks with them over the phone, it is apparent how much they have aged even in the last few years. Plaintiff Hannani is distressed that her parents may pass away before they are able to reunite and be together. If admitted to the United States, Plaintiff Hannani would be able to care for her parents in their old age.

204.    Plaintiff Hannani's separation from her son is even more painful for her. He came to the United States seven years ago, when he was seventeen, to pursue his education, and

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

he is unable to travel back to Iran because of the political situation there. As a result, Plaintiff Hannani has missed her son's maturation from a teenager into a young man, and she and her husband and daughter were not able to be present when he graduated from university and earned his Bachelor's degree. Plaintiff Hannani is now afraid that she will not be able to attend his graduation from medical school and will miss this important milestone in his life. Although Plaintiff Hannani speaks to her son on a regular basis via phone and on-line communication apps like WhatsApp, she knows that her son, like she and her husband, is depressed due to their separation. Plaintiff Hannani and her husband do their best to hide their anxiety and depression at being separated from their son when they speak with him, but it has become increasingly difficult to do so.

205.    **Plaintiff Nicolas Hanout**, a Lawful Permanent Resident, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. Three years ago, he married his wife, a Syrian national, and subsequently filed an I-130 immigrant visa petition on her behalf in 2016.

206.    After Plaintiff Hanout's I-130 petition for his wife was approved, she appeared for her consular interview at the United States Embassy in Jordan in April 2018. The consular interview only lasted ten to fifteen minutes, during which time the consular officer told her that she was eligible for a waiver from the Proclamation and asked her to provide answers to questions substantially similar to those on Form DS-5535, Supplemental Questions for Visa Applicants. After she promptly provided answers to the questions, Plaintiff Hanout placed a follow-up call to the Embassy to ask whether he needed to do anything else for his wife's visa application. He was told to wait for the Embassy to call him.

207.    The separation from his wife has placed great emotional and financial strain on Plaintiff Hanout. It pains him that he has missed birthdays and wedding anniversaries with his wife. Although they would like to start a family together, they do not know when this will even be possible because there is no certainty as to when and where they will be together permanently.

CLASS ACTION COMPLAINT - 42
NO.

208.    Because his wife cannot come to the United States to be with him, Plaintiff Hanout tries to visit her as much as he can to keep their relationship healthy, even though this is no real substitute for being together in the same place and being able to plan their life together. But traveling to Al Mouzeina, Syria is expensive and dangerous; every trip requires four days of round-trip travel and thousands of dollars for transport, and all entry points to Syria are through or near conflict zones, where international travelers are vulnerable to attack, extortion, harassment, and detainment. As a result, Plaintiff Hanout is self-employed as a care giver, and has had to postpone his graduate studies and pass up professional opportunities, to maintain the necessary level of flexibility and income that will allow him to see his wife for more than just a couple weeks out of the year. Indeed, both he and his wife have had to postpone their Master's degrees in computer science because of their uncertainty about their future together. Because he spends all his available time and savings traveling to visit his wife, he has been unable to save to buy a home for the family he and his wife wish to have.

209.    Not being able to live with his wife and start a family together is excruciating for Plaintiff Hanout. He is concerned about his wife's well-being because their separation has caused her to suffer from depression. Their constant worry about their future plans makes it impossible for them to talk about normal, everyday things in the course of their daily lives because their indefinite separation always intrudes on their thoughts and conversations. The waiver process is now prolonging Plaintiff Hanout's separation from his wife and he is afraid they will never be allowed to live together in the United States.

210.    **Plaintiff Hossein Zamani Hosseinabadi**, an Iranian national lawfully present in the United States pursuing an electrical engineering Ph.D. on an F-1 student visa, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. As a result of the waiver process, his father-in-law, brother, sister-in-law, and mother have been prevented or discouraged from coming to the United States. Because Plaintiff Zamani Hosseinabadi himself is present in the United States on a student visa, he fears that if he ever attempts to visit his family in Iran, he will not be allowed to reenter the United States.

CLASS ACTION COMPLAINT - 43
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

211.   When he learned that his wife, who is also pursuing a doctoral degree on an F-1 visa, was pregnant with their first child, Plaintiff Zamani Hosseinabadi worked with his wife's parents to apply for tourist visas so they could come to the United States for the birth of their first grandchild and to provide temporary help Plaintiff Zamani Hosseinabadi, his wife, and their newborn. Plaintiff Zamani Hosseinabadi's parents-in-law interviewed at the U.S. Embassy in Dubai on October 12, 2017.

212.   Because this interview took place before the Proclamation went into effect, Plaintiff Zamani Hosseinabadi's parents-in-law had no opportunity to present evidence of their eligibility for a waiver, or were even aware of the requirement of a waiver. A visa for Plaintiff Zamani Hosseinabadi's mother-in-law was approved shortly after her interview. Months later, she visited Plaintiff Zamani Hosseinabadi, his wife, and child in the United States before returning to Iran.

213.   The visa application for Plaintiff Zamani Hosseinabadi's father-in-law, however, was placed in administrative processing. Subsequently, in January 2018, Plaintiff Zamani Hosseinabadi's father-in-law received a letter informing him that he had been found ineligible for a visa pursuant to the Proclamation and that he would not be granted a waiver. While the Embassy's letter states that Plaintiff Zamani Hosseinabadi's father-in-law may resubmit a visa application, he is skeptical a visa or waiver would be granted in his case and is reluctant to reapply because he cannot afford the cost of attending interviews in Dubai.

214.   Plaintiff Zamani Hosseinabadi was also relying on his brother and sister-in-law to assist with caring for his child. After being selected for a visa through the diversity visa lottery program, Plaintiff Zamani Hosseinabadi's brother interviewed at the U.S. Embassy in Abu Dhabi in March 2018. Although Plaintiff Zamani Hosseinabadi had prepared documentation about himself and his child in the United States for his brother to bring to his consular interview, officials at the Embassy informed his brother even before the interview occurred, as well as at the interview itself, that he would not be granted a visa because of the Proclamation and would not be granted a waiver.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

215.    Because of the experiences his brother and father-in-law have had with the waiver process, Plaintiff Zamani Hosseinabadi has delayed applying for a tourist visa for his own mother, who he hoped would be able to meet and help care for his newborn child. Like his father-in-law, Plaintiff Zamani Hosseinabadi's mother is of modest means and cannot afford to travel to Dubai for interviews given the uncertainty created by the waiver process.

216.    Plaintiff Zamani Hosseinabadi's father-in-law, brother, sister-in-law, and mother now worry they will never be able to meet Plaintiff Zamani Hosseinabadi's new child. The separation from their family has been incredibly difficult for Plaintiff Zamani Hosseinabadi and his wife. Because the couple cannot afford to pay for childcare, they had planned to rely on Plaintiff Zamani Hosseinabadi's family to provide additional care for their child in those early months, as well as emotional support. Without Plaintiff Zamani Hosseinabadi's family's help, the couple has had difficulty balancing their roles as new parents with the obligations of their doctoral studies. The couple worries that if one of them were to take a leave of absence from their doctoral studies to care for their child, they would jeopardize their visa status.

217.    Because their family members cannot come to the United States to visit them, Plaintiff Zamani Hosseinabadi and his wife would like to travel to Iran so that their family can meet their new child. But because both Plaintiff Zamani Hosseinabadi and his wife are in the U.S. on single-entry student visas, they fear that they will be denied a new visa and reentry to the U.S. upon attempting to return, stalling and perhaps ending their doctoral studies. This has taken a considerable emotional toll on Plaintiff Zamani Hosseinabadi and his wife, as both worry that given the waiver process, they will need to wait another four to five years until their parents can see their grandchild.

218.    **Plaintiff Hoda Mehrabi Mohammadabadi**, a national of Iran, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. She has applied for an EB-5 investor visa and has made a $500,000 investment in the United States, primarily with funds irrevocably gifted by her parents in lieu future inheritance, which she will never be able to recover without a waiver and a visa.

CLASS ACTION COMPLAINT - 45
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

219.    Under the EB-5 program, EB-5 investors must invest in a new commercial enterprise that will create full-time positions for at least 10 qualifying employees. An investment of at least $500,000 is required when a prospective investor is investing in a "Targeted Employment Area" that is either a high-unemployment or rural area. Using most of an irrevocable gift from her parents, Plaintiff Mohammadabadi has invested $500,000 in a Kimpton Hotel project in Milwaukee, Wisconsin, which is part of the Metropolitan Milwaukee Association of Commerce Regional Center, an organization designated by USCIS to sponsor capital investment projects for investment by EB-5 investors. Plaintiff Mohammadabadi's investment has been used to create jobs in Milwaukee, Wisconsin, and to develop a new Kimpton Hotel that will support tourism and businesses in the area for decades to come.

220.    Plaintiff Mohammadabadi chose to use her parents' irrevocable gift to apply for an EB-5 investor visa because it was the fastest way for her to obtain a visa and emigrate to the United States to pursue an architecture career, which has been difficult for her to do as a woman in Iran, and to reunite with her sister, who is an asylum applicant and her closest relative. The two women are separated by age by just a year and were deeply interdependent as they grew up. When her sister emigrated to the United States, Plaintiff Mohammadabadi followed to be near her sister and pursue her Master of Architecture degree. She was unable to finish the required thesis and was forced to return to Iran in 2013 so she would not violate her student visa, but Plaintiff Mohammadabadi realized that her long-term professional prospects in Iran were limited, that she had fallen in love with the United States, and that she wanted to be close to her sister on a permanent basis.

221.    Plaintiff Mohammadabadi's parents subsequently decided to distribute their life savings to their daughters, which amounted to just over $500,000 each, telling their daughters that the only way they could guarantee that the inheritance went to their daughters, and be able to see their daughters make use of it, was by giving it to them before they passed away. Plaintiff Mohammadabadi decided to use most of her parents' irrevocable gift to pursue an EB-5 visa so she could come to the United States as quickly as possible to reunite with her sister, finish her

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Master's degree, and pursue a career in architecture. At the moment, Plaintiff Mohammadabadi's sister cannot file an I-130 petition for her because her asylum case has been pending for more than two years. Although her sister could file such a petition after becoming a citizen, the process would take over 25 years due to the wait time for sibling petitions.

222.    Plaintiff Mohammadabadi's I-526 Immigrant Petition for Alien Entrepreneur was approved in less than two years in June 2016, and she appeared for her consular interview at the United States Embassy in Yerevan, Armenia, in February 2017. Because this interview occurred before the Proclamation went into effect, she had no notice that a waiver might be required and no opportunity to present evidence of her eligibility for a waiver. Nevertheless, less than a week after the Proclamation went into effect, on December 14, 2018, the embassy in Yerevan issued Plaintiff Mohammadabadi a Waiver Refusal Worksheet stating that she had been found ineligible for a visa under the Proclamation—one of hundreds, if not thousands of perfunctory denials issued after the Proclamation took effect. She was not given an opportunity to request a waiver under the Proclamation and has heard nothing from the embassy ever since.

223.    Because Plaintiff Mohammadabadi's priority date for her approved I-526 petition is current under the State Department's Visa Bulletin, which summarizes the availability of immigrant visas each month, she would be immediately eligible for an EB-5 investor visa if it were not for her waiver denial under the Proclamation.

224.    The denial of a waiver has been devastating to Plaintiff Mohammadabadi. Her $500,000 investment, which represents most of her gifted inheritance from her parents and the majority of her wealth in the world, is at risk. Because she would never be able to recover that amount of money in Iran as a woman, Plaintiff Mohammadbabadi would never again be able to make such an investment again if she were to lose it.

225.    Because her waiver has been denied, Plaintiff Mohammadabadi is also at risk of losing her Master's degree, which she must complete soon by completing her thesis and defending it in person at the University of Hartford. Because EB-5 visas are typically granted within two years and she was advised that it would be unlikely for her to be granted another

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1    student visa while her EB-5 visa petition was pending, she decided to wait until receiving her

2    EB-5 visa to complete her degree. But she has now been denied a waiver, and if she is not

3    granted re-entry to the United States to complete her thesis, she will lose the credits she had

4    accumulated and all her studies will have been for nothing.

5        226.    Plaintiff Mohammadabadi also despairs of ever being able to reunite with her

6    sister. Because of the degrading relations between the United States and Iran and her sister's

7    pending asylum application, it is impossible for Plaintiff Mohammadabadi's sister to return to

8    Iran safely to visit her even briefly, and although they talk to each other almost every day, it is

9    not the same as being together in the same place. When Plaintiff Mohammadabadi's I-526

10    petition was approved, the two sisters rejoiced at the prospect of reuniting in the United States.

11    That prospect is now indefinitely on hold, if not extinguished, because of the waiver process.

12        227.    **Plaintiff Maral Tabrizi**, a Lawful Permanent Resident, has suffered and will

13    continue to suffer harm because of the Proclamation and the waiver process. After Plaintiff

14    Tabrizi told her mother and father she was pregnant with her first child, they applied for tourist

15    visas, hoping to help Plaintiff Tabrizi and her husband care for her newborn child after her

16    January 2018 delivery date.

17        228.    In October 2017, Plaintiff Tabrizi's parents were granted visa interviews at the

18    U.S. Consulate in Dubai, United Arab Emirates. Shortly after her interview, Plaintiff Tabrizi's

19    mother learned her visa had been approved but decided to delay picking up her visa until the

20    Consulate had approved Plaintiff Tabrizi's father's visa, allowing them to travel to the

21    Consulate in Dubai together. Because their interviews took place before the Proclamation went

22    into effect, Plaintiff Tabrizi's parents had no opportunity to present evidence of their eligibility

23    for a waiver.

24        229.    However, in December 2017, while Plaintiff Tabrizi's mother waited for a

25    decision on her husband's visa, she received a letter from the Consulate stating she had in fact

26    been found ineligible for a visa because of the Proclamation and denied a waiver. Months later,

27    in February 2018, Plaintiff Tabrizi's father received a similar letter. It stated that he too had

CLASS ACTION COMPLAINT - 48
NO.

been found ineligible for a visa pursuant to the Proclamation, and that a waiver would not be granted in his case. Plaintiff Tabrizi's mother had visited the United States previously and complied with all requirements of her visa.

230.    Although Plaintiff Tabrizi had hoped that her parents would receive visas in time for them to be present for the birth of her baby, they did not. Plaintiff Tabrizi gave birth in February 2018, and both she and her parents were devastated that her parents could not be there. They worry whether Plaintiff Tabrizi's parents will ever be able to meet their grandchild.

231.    The situation has caused Plaintiff Tabrizi anxiety and depression. Plaintiff Tabrizi had expected her parents to help care for her child during the first months after her delivery, allowing Plaintiff and her husband to return to work. Because Plaintiff Tabrizi cannot afford a caregiver, she has entrusted care of her child to her sister-in-law while she is at work. However, because of her sister-in-law's medical condition and obligations to three other young children, she is unable to provide the regular attention and care Plaintiff Tabrizi expected her parents would provide for her infant child.

232.    Plaintiff Tabrizi has also had difficulty caring for her child because of a painful connective tissue disorder, which has made it difficult for her to bear the burdens of being a new parent. The waiver process has only prolonged the considerable hardship Plaintiff Tabrizi has faced without her parents' assistance and emotional support.

233.    **Plaintiff John Doe #1**, a native-born U.S. citizen, has suffered and will continue to suffer harm because of the Proclamation and the waiver process. Living conditions in Libya have become increasingly difficult and dangerous for Plaintiff John Doe #1's aging parents, and he wishes to bring them to the United States so he can take care of them.

234.    After Plaintiff John Doe #1 received an approval for his I-130 petition for his parents in September 2014, his parents were scheduled for an interview at the U.S. Consulate General in Casablanca in October 2016. But because Morocco now requires Libyans to have visas to enter the country, Plaintiff John Doe #1 had to reschedule his parents' consular interview appointment to get his parents travel visas that would allow them to fly to Morocco.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

They ultimately had to make three international trips—first, to apply for the Moroccan visa in Tunisia; again, to pick the visa up in Tunisia; and a third time to appear for the actual consular interview in Morocco in January 2017.

235.    At the interview, the consular officer requested additional paperwork, such as police records and an affidavit of support. Although John Doe #1 and his parents were diligent in gathering the requested paperwork, this process was extremely time-consuming because of delays in the consulate's responses to any communications. For example, it took the consulate four months to tell John Doe #1 that he needed to provide originals of his parents' police records, not copies. The consulate ultimately confirmed in October 2017 that they required no further information, and said that Plaintiff John Doe #1's parents' visa applications were in administrative processing.

236.    In January 2018, Plaintiff John Doe #1 received an e-mail stating that his parents' visas had been refused under the Proclamation. He and his parents were devastated.

237.    After speaking to an attorney, Plaintiff John Doe #1 learned about the waivers available under the Proclamation. In March 2018, he e-mailed the consulate to formally request a waiver for his parents, providing information to support the request. A week later, the government sent Plaintiff John Doe #1 a form e-mail, identical to the one he'd received in January, stating that his parents' visas had been refused under the Proclamation.

238.    The uncertainty about his parents' visas, as well as the difficult situation his parents are living in, has frustrated and depressed John Doe #1. He is unable to sleep at night and has recently considered applying for medical leave under the Family and Medical Leave Act to get psychiatric treatment. He worries about his parents' safety constantly because Libya is politically unstable and civilians like his parents are at the mercy of armed militias and gangs, who regularly kidnap people for ransom. An old high school classmate, who lives in the same town as John Doe #1's parents, was recently kidnapped and held for over $100,000 in ransom, and John Doe #1 fears that this could happen to his parents, too. Apart from the danger presented

CLASS ACTION COMPLAINT - 50
NO.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

1    by the militias, his parents have health issues and do not always have access to food and health

2    care.

3        239.    Plaintiff John Doe #1 has been extremely disappointed by the Proclamation and

4    the waiver process. He does not understand how he, a U.S. citizen, can be prevented from seeing

5    his parents and bringing them to safety. The form letters he has received from the consulate

6    make it seem to him like the government won't even acknowledge his existence or his

7    humanity. He feels like the government is treating his family this way because they are Muslim.

8        240.    **Plaintiff John Doe #2**, a U.S. citizen, has suffered and will continue to suffer

9    harm because of the Proclamation and the waiver process. He and his two U.S. citizen

10    daughters, aged seven and eleven, have been separated from his wife and their mother since

11    2016. In August 2016, Plaintiff Doe #2 filed an I-130 immigrant visa petition for his wife so

12    that their family can reunite and live together in Michigan.

13        241.    After Plaintiff John Doe #2's I-130 petition for his wife was approved, she

14    interviewed at the U.S. Embassy in Djibouti in late December 2017. Despite informing her that

15    her application was strong, and despite failing to inquire about any of the waiver eligibility

16    criteria, the consular officer informed Plaintiff John Doe #2's wife that she was ineligible for a

17    visa pursuant to the Proclamation and denied her a waiver. Before handing her a letter indicating

18    her visa ineligibility and waiver denial, the officer told Plaintiff John Doe #2's wife that if it

19    were his decision to make, he would have granted her a visa.

20        242.    The Consulate's decision to deny Plaintiff John Doe #2's wife a waiver has

21    devastated Plaintiff John Doe #2 and his family. Plaintiff John Doe #2's seven- and eleven-

22    year-old daughters are confused, anxious, and heartbroken their mother cannot be with them in

23    the U.S. Plaintiff Doe #2's wife desperately misses her children and worries about them

24    constantly. She does so while living thousands of miles away in a neighborhood that has

25    experienced armed violence and missile strikes because of the conflict in Yemen. Plaintiff John

26    Doe #2 is also anguished and overwhelmed, as he cares for two young daughters without their

27    mother's support and care.

CLASS ACTION COMPLAINT - 51
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

243.    After the end of his daughters' school semester in spring 2018, Plaintiff John Doe #2 traveled with them to Egypt, a place where they have no family, so that they could be briefly reunited with their mother, who traveled to meet them there. In order to make the trip, Plaintiff John Doe #2 had to leave his job and now lives off his family's savings. Given the family's strained financial situation, as well as the need for his daughters to continue their education in the United States, Plaintiff John Doe #2 does not believe he can remain in Egypt for long or make repeated trips with his daughters to visit their mother.

244.    **Plaintiff John Doe #3**, a native-born U.S. citizen, has suffered and will continue to suffer harm because of the Proclamation and the waiver process, which are prolonging his separation from the love of his life and future wife-to-be, Plaintiff Jane Doe #1, and indefinitely placing his dreams for the future on hold.

245.    In 2009, he met and established a relationship with his fiancée, Plaintiff Jane Doe #1, while they were exchange students in Dubai. Several years later they rekindled their relationship while Plaintiff John Doe #3 was stationed in the Middle East as part of his work with the U.S. government. When in 2017, they became engaged, Plaintiff John Doe #3 was elated and his entire family traveled to Dubai, UAE, for the engagement celebration. They planned a wedding in Southern California and began making arrangements, including arranging for Plaintiff Jane Doe #1's move to the United States.

246.    Plaintiff John Doe #3's I-129F petition on behalf of Plaintiff Jane Doe #1 was approved in early April of this year, giving Plaintiff Jane Doe #1 a four-month window to apply for and receive a K-1 fiancée visa. Believing Plaintiff Jane Doe #1's visa approval imminent, Plaintiff John Doe #3 set about deciding on career opportunities in a location conducive for his fiancée to continue her professional work, finding a larger (and more expensive) apartment for them both, purchasing personal items she would need, planning their wedding in the U.S., adding her to bank and financial accounts, and planning future family vacations. All of this has amounted to significant mental and emotional energy for John Doe #3 and great financial expense.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

247.    To Plaintiff John Doe #3's shock, however, Plaintiff Jane Doe #1's visa was denied within minutes of her arriving at the consulate for her consular interview.  Plaintiff John Doe #3 is heartbroken to face the now indefinite separation from his fiancée.  Moreover, due to the nature of his prior work with the U.S. government and recent data breaches which have caused his employment and clearance information to be made public, Plaintiff John Doe #3 is unable to travel to Iran to visit his fiancée, nor can the couple marry abroad. Plaintiff John Doe #3 has reason to believe his affiliation to the U.S. Government, if made known to the Government of Iran, could adversely affect Plaintiff Jane Doe #1 or her family members, some of whom reside in Iran.

248.    Plaintiff John Doe #3 has spent countless hours trying to determine what can be done to secure his fiancée's travel to the United States within the four-month period his approved I-129F petition is valid.  He has spoken with his U.S. Representative's office, numerous immigration practitioners, a senior U.S. diplomat, and several officers in the U.S. Departments of State and Homeland Security.  In this correspondence, he has received conflicting and confusing advice – some have absolutely no information about the waiver process, some have suggested he should first get married and then reapply, others have said there is nothing to do but wait for the ban to be lifted and then re-apply, and still others have suggested that completing various additional forms may allow his fiancée's application to be reconsidered. One U.S. State Department official indicated to Plaintiff John Doe #3 that waiver considerations are not decided by consular officers, as stated in Section 3 of the Presidential Proclamation, but instead brought before a panel at the Department's headquarters in Washington, D.C. This has left Plaintiff John Doe #3 confused and desperate for accurate information about what to do next.

249.    Plaintiff John Doe #3 has also spent considerable financial resources in support of being reunited with Plaintiff Jane Doe #1, including fees related to the I-129F petition, fees related to the visa application, significant travel expenses for him and his fiancée, and legal advice – amounting to over $11,000 over the past several months. He cannot maintain this level

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

1  of expense to continue re-submitting the I-129F petition every four months if his fiancée

2  continues to be denied a waiver under the current process.

3      250.   **Plaintiff Jane Doe #1**, an Iranian national, has suffered and will continue to

4  suffer harm because of the Proclamation and the waiver process.  She grew up primarily in the

5  United States, where she lived for nearly a decade, and she attended a U.S. university for her

6  undergraduate studies.  While she was studying abroad during her undergraduate studies in

7  Dubai, she met Plaintiff John Doe #3.

8      251.   She applied for a K-1 visa as the beneficiary of Plaintiff John Doe #3's approved

9  I-129F petition.  At the time she was living in Oman under a work visa.  In the Spring of 2018

10  she received notice from the U.S. Embassy in Muscat, Oman, that she should schedule her

11  consular interview.  The notice did not provide any indication that the Presidential Proclamation

12  would preclude her family from being together.  She promptly scheduled her interview and

13  arranged to make the several-hour journey to the consulate office.

14      252.   Because a condition of her employment required her to provide at least 3

15  months' notice before resigning and the K-1 visa, once granted, is only good for a short window

16  of time, she resigned from her position to ensure that the effective date of her resignation would

17  fall within that window.

18      253.   When Plaintiff Jane Doe #1 arrived at her consular interview, she brought all of

19  the paperwork suggested in the consulate's "Instructions for a Nonimmigrant Visa for

20  Fiancé(e)," including full copies of the initial I-129F approved application, prior DHS USCIS

21  approval notices, the I-134, and all required and suggested supporting documentation.  None of

22  the paperwork she received from the consulate in advance of the interview noted the

23  Proclamation or the waiver process.  Plaintiff Jane Doe #1's consular interview lasted only

24  several minutes.  She was not asked any questions related to the waiver criteria and she was not

25  provided an opportunity to present evidence that might demonstrate her eligibility for a waiver.

26      254.   After her interview, Plaintiff Jane Doe #1 received a notice indicating she had

27  been denied a visa under the Proclamation and denied a waiver.  She was devastated.  Not only

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

were her plans to reunite with her fiancé and get married now indefinitely on hold, but she had already made provisions to leave Oman for the United States, including by resigning from her job.  As a result, Plaintiff Jane Doe #1 will be imminently losing her residency in Oman, which was conditioned on her remaining employed, and she will soon be forced to return to Iran. She is ineligible to return to her previous employer without going through a lengthy selection process (which may lead to denial), and since she studied at a U.S. accredited school for her graduate degree and lacks a native understanding of Farsi, she is ineligible to continue her vocation in her home country of Iran.  The Presidential Proclamation has left her with no employment options and forced her into a nomadic lifestyle attempting to figure out what is next.  She has no present income, and instead will require John Doe #3's continual financial support.

255.    **Organizational Plaintiff Pars Equality Center** has suffered and will continue to suffer harm because of the Proclamation and the waiver process. Since the Proclamation took effect and Defendants began implementing the waiver provision, the Pars legal team has been inundated with telephone calls, emails, and messages from community members asking questions and expressing concerns. Individuals with different immigration status — dual citizens, lawful permanent residents, visa holders, asylees, refugees, those seeking protected status, and Iranian refugee applicants outside the United States — have called Pars with anxious questions about how the Proclamation and waiver process will affect them or their loved ones. Responding to these inquiries has diverted significant resources from other areas of Pars' practice and services.  Instead of devoting its resources to representing clients in their immigration cases, the Pars legal team has been forced to spend most of its time advising clients and other community members on the Proclamation and assisting individuals in seeking waivers, work which has almost entirely culminated in a dead end.

256.    Pars continues to respond to an overwhelming volume of inquiries—at least 15 every week—including many email inquiries and in-person consultations. Pars has to continually update its website with up-to-date information about the Proclamation and the

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

waiver process.  As a result of the Proclamation and its attendant waiver requirement, Pars has produced weekly video content on its Facebook and Instagram pages to provide the community with desperately sought after information, as well as distributed regular press releases, all at the expense of its regular immigration services.

257.    Members of the Pars legal team have met with over one hundred affected individuals, either in person or telephonically, answered their waiver inquiries and in some cases, signed retainer agreements to represent them in seeking a waiver. Preparing waiver packets for individuals affected by the Proclamation is an arduous process, involving hours of long-distance communication with visa applicants abroad.  The time and effort spent in seeking waivers for clients have exhausted Pars' legal resources, an expenditure that has gone to waste because none of Pars' clients have thus far obtained a final waiver approval.

258.    Furthermore, the Proclamation and ineffectual waiver process have the long-term effect of reducing Pars' potential client pool – indefinitely.  One of the central tenets of Pars' mission is to assist Iranian immigrants with their integration into America society.  Close to 90 percent of Pars' immigration and social services clients are Iranian immigrants.  The Proclamation's bar on admission for Iranian nationals and the inability to meaningfully access a waiver for these clients puts Pars' continued operation in serious jeopardy.

259.    The grants that Pars receives from the County of Santa Clara and the State of California are dependent on the number of immigration consultations performed and the number of immigration cases filed per quarter.  Because Iranian immigrants are no longer allowed entry, Pars risks losing 90 percent of its clientele, thereby putting Pars at risk of failing to meet its grant deliverables.  This would have a devastating impact on Pars' operating budget, potentially forcing it to drastically cut its workforce and even forcing it to cease operations.

260.    As a result of the Proclamation and Defendants' implementation of the waiver provision, the existing Iranian American community who have been Pars' clients for many years now feel stigmatized and discriminated against.  The effect of these policies has been to instill fear and anxiety in the Iranian American community, exacerbating challenges that

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

immigrants, especially those from primarily Muslim countries, already face in the United States. Pars' clients have expressed fear of being treated as second class citizens, which has in turn undermined Pars' civic engagement efforts and citizenship curriculum by instilling a loss of faith in the system among the participants. The Proclamation and waiver process have restricted Pars' ability to carry out its work and mission.

261. In addition to the harms Pars faces directly, Pars has existing and prospective clients who will be harmed by the Proclamation and Defendants' implementation of the waiver provision. These clients face numerous barriers to participating directly in a lawsuit challenging the waiver process. These include, but are not limited to, unfamiliarity with the U.S. legal system, fears over whether participation in a lawsuit could jeopardize their ability to reunite with family members abroad, and various language and cultural barriers.

262. **Organizational Plaintiff OneAmerica** has suffered and will continue to suffer harm because of the Proclamation and the waiver process. Since the Proclamation went into effect on December 8, 2017, OneAmerica has been forced to focus a growing percentage of community education work on the Proclamation and Defendants' implementation of the waiver provision.

263. OneAmerica has had to reassign existing staff away from prior commitments to work focused on the Proclamation and the waiver process.

264. One of OneAmerica's full-time organizers is now spending about one-third of her time on know-your-rights trainings related to the Proclamation and the waiver process. Prior to this shift in her work, her time was dedicated to building up an educational reform program that OneAmerica has been working on for the past 5 years. This organizer's efforts on the educational reform project, which involved organizing parents, students, teachers, and school administrators to expand access to bilingual education in the State of Washington, has now all but ceased as a result of the Proclamation and waiver process.

CLASS ACTION COMPLAINT - 57
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

265.    Expanding access to bilingual education is a core component of OneAmerica's mission to build power in immigrant communities through organizing, and advance democracy through civic engagement.

266.    Another one of OneAmerica's full-time organizers has had to shift approximately one-third of her work away from organizing small business owners in the Muslim community towards answering concerns and providing community education on the Proclamation and the waiver process.

267.    The success of OneAmerica's work is largely dependent on active participation by its membership in OneAmerica organized-events and community education efforts. The Proclamation and its attendant waiver process has had a chilling effect on the willingness of Muslim community members to participate because of the fear that it has caused in the community.

268.    The Proclamation and Defendants' implementation of the waiver provision has caused OneAmerica to divert resources away from its core mission and organizational commitments and priorities and has chilled participation of Muslim community members in particular, thereby harming OneAmerica's ability to achieve its core mission and purpose.

## Class Allegations

269.    Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), on behalf of themselves and all other persons in the United States for whom the Defendants' implementation of the waiver provision interferes with family reunification or the ability to travel internationally and return to the United States. This class includes:

a.    Individuals in the United States with an approved petition to be reunited with family members who are (i) a national of Iran, Libya, Somalia, Syria, or Yemen (the "Designated Countries"), (ii) subject to the Proclamation, and (iii) currently awaiting a decision on a waiver or have been denied a waiver ("U.S. Petitioner Subclass");

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

b.   Nationals of the Designated Countries who are lawfully present in the United States who, but for the uncertainty created by the Proclamation and Defendants' implementation of the waiver provision, wish to travel abroad and return to the United States ("Lawfully Present Foreign National Subclass");

c.   Individuals who have applied for a visa who are (i) nationals of the Designated Countries, (ii) subject to the Proclamation, and (iii) currently awaiting a decision on a waiver or have been denied a waiver ("Visa Applicant Subclass").

270.   The Plaintiff Class is so numerous that joinder is impracticable.

271.   According to the Annual Report of the Visa Office, in 2017, the last year for which data are available, the United States issued approximately 45,901 immigrant and non-immigrant visas to nationals from the five countries banned by the Proclamation.

272.   The claims of the Plaintiff Class members share common issues of law, including but not limited to whether the Defendants' implementation of the waiver provision violates their rights under the APA, INA, and Fifth Amendment of the U.S. Constitution.

273.   The claims of the Plaintiff Class members share common issues of fact, including but not limited to the manner of process provided by Defendants' implementation of the waiver provision, and whether that process has prevented or will prevent them or their family members from reuniting, or from re-entering the United States should they choose to leave briefly.

274.   The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the members of the Plaintiff Class.

275.   The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class.  The named Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class.  The attorneys representing the named Plaintiffs include experienced civil rights attorneys who are considered able practitioners in federal constitutional litigation.  These attorneys should be appointed as class counsel.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

276.    Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole.  The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

277.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class.  The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Administrative Procedure Act)
(On behalf of All Plaintiffs, including the Class)

278.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

279.    Defendants have taken a number of actions in purported reliance on Section 3(c) of the Proclamation, including but not limited to issuing the "worldwide guidance" referenced in the State Department's February 22 letter and the State Department guidance, cables, sample Q's & A's and instructions referenced in the Richardson declaration, as set forth above.

280.    The actions Defendants have taken in purported reliance on Section 3(c) of the Proclamation constitute final agency action(s) within the meaning of the Administrative Procedure Act. *See Bennett v. Spear*, 520 U.S. 154 (1997).

281.    Defendants' actions have resulted in a waiver process in which, among other things, visa applicants have been denied waivers without ever having received notice of a waiver process, and/or have been denied waivers without ever having had a consular interview or other opportunity to provide evidence of their eligibility for a waiver, in contravention of 22 C.F.R. §§ 41.121 and 42.81, which state that when refusing the issuance of a visa, a consular officer must inform the visa applicant "whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal." *See* 22 C.F.R. § 41.121(b)(1).

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

282.    Defendants' actions have resulted in a waiver process in which, among other things, visa applicants have had no consistent or meaningful process by which to submit evidence of waiver eligibility or to have such evidence considered by consular officers, which has resulted in vastly different practices within and across consulates.

283.    Defendants' actions have resulted in a waiver process in which, among other things, the eligibility criteria for a waiver and the exemplar situations in which a waiver may be appropriate, as set out in the Proclamation, have been misinterpreted and misapplied to require a higher standard of proof of visa applicants than the Proclamation itself requires.

284.    Defendants' actions have resulted in a waiver process in which, among other things, consular officers do not have discretion over whether and when to grant a waiver, and thus no discretion over whether they may grant a visa to an individual subject to the Proclamation, in contravention of the Proclamation itself as well as 8 U.S.C. § 1104(a), which states that consular officers have complete discretion over the issuance of visas and that such discretion may not be circumscribed by the Secretary of State.

285.    Defendants' actions, as set forth above, are based on legal error; failed to consider all relevant factors; are contrary to the Proclamation; and lacked a rational explanation, particularly in light of the reliance interests at stake; and are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

286.    Defendants' actions, as set forth above, are contrary to constitutional rights, including Plaintiffs' rights not to be deprived of their liberty interest in family reunification, and statutory and regulatory rights to petition for visas for their family members, without due process and as protected by the First and Fifth Amendments to the U.S. Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

287.    Defendants' actions, as set forth above, are *ultra vires* and in excess of any authority granted by the Proclamation, regulation, or statute, including 8 U.S.C. §1104(a), and not otherwise in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

§ 706(2)(C). Defendants' actions, as set forth above, affect the Plaintiffs' substantive rights and were made without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D).

## SECOND CLAIM FOR RELIEF
### (*Accardi* Doctrine & Administrative Procedure Act)
### (On behalf of All Plaintiffs, including the Class)

288.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

289.     Defendants' actions have resulted in a waiver process in which, among other things, visa applicants have been denied waivers without ever having received notice of a waiver process, and/or have been denied waivers without ever having had a consular interview or other opportunity to provide evidence of their eligibility for a waiver, in contravention of 22 C.F.R. §§ 41.121 and 42.81, which state that when refusing the issuance of a visa, a consular officer must inform the visa applicant "whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal." *See* 22 C.F.R. § 41.121(b)(1).

290.     Defendants' actions have resulted in a waiver process in which, among other things, the eligibility criteria for a waiver and the exemplar situations in which a waiver may be appropriate, as set out in the Proclamation, have been misinterpreted and misapplied to require a higher standard of proof of visa applicants than the Proclamation itself requires.

291.     Defendants' actions have resulted in a waiver process in which, among other things, consular officers do not have discretion over whether and when to grant a waiver, and thus no discretion over whether they may grant a visa to an individual subject to the Proclamation, in contravention of the Proclamation itself as well as 8 U.S.C. § 1104(a), which states that consular officers have complete discretion over the issuance of visas and that such discretion may not be circumscribed by the Secretary of State.

292.     Defendants' actions, as set forth above, violate agency procedures, including those found at 22 C.F.R. §§ 41.121 and 42.81, which state that when refusing the issuance of a

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

visa, a consular officer must inform the visa applicant "whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal." *See* 22 C.F.R. § 41.121(b)(1).

293.    Defendants' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

294.    Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
**(Due Process, Fifth Amendment to the U.S. Constitution)**
**(On behalf of Plaintiffs Whitehall Raghebi, Hassan, Siraji, Ahmed, Azimi, Ghaleb, Hanout, Zamani Hosseinabadi, Tabrizi, John Does #1-3, Pars, OneAmerica, and the "U.S. Petitioner Subclass")**

295.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

296.    Defendants' actions have resulted in a waiver process in which, among other things, visa applicants have been denied waivers without ever having received notice of a waiver process, and/or have been denied waivers without ever having had a consular interview or other opportunity to provide evidence of their eligibility for a waiver, in contravention of 22 C.F.R. §§ 41.121 and 42.81, which state that when refusing the issuance of a visa, a consular officer must inform the visa applicant "whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal." *See* 22 C.F.R. § 41.121(b)(1).

297.    Defendants' actions have resulted in a waiver process in which, among other things, visa applicants have had no consistent or meaningful process by which to submit evidence of waiver eligibility or to have such evidence considered by consular officers, which has resulted in vastly different practices within and across consulates.

298.    Defendants' actions have resulted in a waiver process in which, among other things, the eligibility criteria for a waiver and the exemplar situations in which a waiver may be appropriate, as set out in the Proclamation, have been misinterpreted and misapplied to require a higher standard of proof of visa applicants than the Proclamation itself requires.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

299.    Defendants' actions have resulted in a waiver process in which, among other things, consular officers do not have discretion over whether and when to grant a waiver, and thus no discretion over whether they may grant a visa to an individual subject to the Proclamation, in contravention of the Proclamation itself as well as 8 U.S.C. § 1104(a), which states that consular officers have complete discretion over the issuance of visas and that such discretion may not be circumscribed by the Secretary of State.

300.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law."

301.    Congress has created statutory rights related to the petitioning for and issuance of visas and other immigration benefits.

302.    Federal agencies have created regulatory rights related to the petitioning for and issuance of visas and other immigration benefits.

303.    Individuals must be given due process prior to the deprivation of these statutory and regulatory rights.

304.    Additionally, United States citizens and lawful permanent residents have constitutionally protected liberty interests in family reunification and in the ability of their family members to travel to the United States. Individuals must be given due process prior to any deprivation of these liberty interests.

305.    Defendants' actions, as set forth above, deprive individuals, including Plaintiffs and their members or clients, of the aforementioned statutory and regulatory rights, and liberty interests, without due process.

306.    Defendants' actions, as set forth above, thus violate the procedural due process guarantee of the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

CLASS ACTION COMPLAINT - 64
NO.

A.  Declare pursuant to 28 U.S.C. § 2201 that that Defendants' actions in implementing and enforcing Section 3(c) of the Presidential Proclamation to date, including the issuance of internal guidance, have been arbitrary, capricious, and otherwise in violation of law, including Section 3(c)(ii) of the Proclamation;

B.  Enjoin Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any portion of Section 3(c) of the Proclamation in a manner that violates the APA, INA, the U.S. Constitution, or Section 3(c) of the Proclamation;

C.  Vacate the agency guidance, policies and procedures that implement Section 3(c) of the Presidential Proclamation;

D.  Remand the agency guidance, policies and procedures to the agencies;

E.  Direct Defendants to publicly issue "guidance" that "address[es] the standards, policies, and procedures" for determining whether an applicant is entitled to a waiver under Section 3(c), and which comports with the APA, the INA, the U.S. Constitution, and Section 3(c) of the Proclamation;

F.  Direct Defendants, including the State Department and its employees, officers, and agents, as well as any other government employee, officer, or agent involved in deciding whether a waiver should be granted to consider all pending and future waivers under the guidance described in Paragraph E;

G.  Direct Defendants, including the State Department and its employees, officers, and agents, as well as any other government employee, officer, or agent involved in deciding whether a waiver should be granted to reconsider waivers for all visa applicants who had been denied or refused waivers before this Court's injunction under the guidance described in Paragraph E;

H.  Certify this case as a class action lawsuit, and appoint class counsel of record, as proposed herein;

I.  Award Plaintiffs costs of suit, and reasonable attorneys' fees and expenses

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1    pursuant to any applicable law; and

2    J.    Grant any other and further relief as the Court deems equitable, just, and proper.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CLASS ACTION COMPLAINT - 66
NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

DATED: July 31, 2018.

|  | LANE POWELL, PC |
|---|---|
|  | By: *s/Darin Sands* <br> Darin Sands, WSBA No. 36865 <br> By: *s/Dustin O'Quinn* <br> Dustin O'Quinn <br> *Pro Hac Vice Pending* <br> By: *s/Jessica Walder* <br> Jessica Walder, WSBA No. 47676 <br> By: *s/Aaron Fickes* <br> Aaron Fickes, WSBA No. 51584 <br> 1420 Fifth Avenue, Suite 4200 <br> P.O. Box 91302 <br> Seattle, WA 98111-9402 <br> Telephone: 206-223-7000 <br> Facsimile: 206-223-7107 <br> Emails: sandsd@lanepowell.com <br> oquinnd@lanepowell.com <br> walderj@lanepowell.com <br> fickesa@lanepowell.com <br><br> *Attorneys for Plaintiffs* |
| NATIONAL IMMIGRATION LAW CENTER <br><br> By: *s/Esther H. Sung* <br> Esther H. Sung <br> *Pro Hac Vice Pending* <br> By: *s/Jana Whalley* <br> Jana Whalley <br> *Pro Hac Vice Pending* <br> By: *s/Joshua Stehlik* <br> Joshua Stehlik <br> *Pro Hac Vice Pending* <br> By: *s/Melissa S. Keaney* <br> Melissa S. Keaney <br> *Pro Hac Vice Pending* <br> By: *s/Nicholas Espiritu* <br> Nicholas Espiritu <br> *Pro Hac Vice Pending* <br> 3450 Wilshire Blvd. #108-62 <br> Los Angeles, CA 90010 <br> Telephone: (213) 639-3900 <br> Emails: sung@nilc.org <br> whalley@nilc.org <br> stehlik@nilc.org <br> keaney@nilc.org <br> espiritu@nilc.org <br><br> *Attorneys for Plaintiffs* | IRANIAN AMERICAN BAR ASSOCIATION <br><br> By: *s/Babak G. Yousefzadeh* <br> Babak G. Yousefzadeh <br> *Pro Hac Vice Pending* <br> 5185 MacArthur Blvd. NW, Suite 624 <br> Washington, DC 20016 <br> Telephone: (415) 774-3191 <br> Email: President@iaba.us <br><br> *Attorney for Plaintiffs* |

CLASS ACTION COMPLAINT - 67
NO.

| ARNOLD & PORTER KAYE SCHOLER LLP | COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA |
|---|---|
| By: *s/John A. Freedman*<br>    John A. Freedman<br>        *Pro Hac Vice Pending*<br>601 Massachusetts Avenue, N.W.<br>Washington, DC 20001-3743<br>Telephone: (202) 942-5000<br>Email: john.freedman@arnoldporter.com<br><br>*Attorney for Plaintiff* | By: *s/Brittney Rezaei*<br>    Brittney Rezaei<br>        *Pro Hac Vice Pending*<br>By: *s/Zahra A. Billoo*<br>    Zahra A. Billoo<br>        *Pro Hac Vice Pending*<br>3160 De La Cruz Blvd., Suite 110<br>Santa Clara, CA 95054<br>Telephone: (408) 986-9874<br>Emails: brezaei@cair.com<br>        zbilloo@cair.com<br><br>*Attorneys for Plaintiffs* |
| ADVANCING JUSTICE – ASIAN LAW CAUCUS<br><br>By: *s/Elica S. Vafaie*<br>    Elica S. Vafaie<br>        *Pro Hac Vice Pending*<br>By: *s/Christina Sinha*<br>    Christina Sinha<br>        *Pro Hac Vice Pending*<br>55 Columbus Ave.<br>San Francisco, CA 94111<br>Telephone: (415) 848-7711<br>Emails: elicav@advancingjustice-alc.org<br>        christinas@advancingjustice-alc.org<br><br>*Attorneys for Plaintiffs* | |

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107