# EXHIBIT A

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALHARBI, AHMED et al., ) | Case No.: 18-cv-2435(BMC) |
| *Plaintiffs*, ) | |
| v. ) | |
| MILLER, STEPHEN et al. ) | **DECLARATION OF CHRISTOPHER RICHARDSON, ESQ.** |
| *Defendants*. ) | |

## DECLARATION OF CHISTOPHER RICHARDSON, ESQ.

I, Christopher Richardson, Esq., do hereby declare:

1) I am a licensed attorney admitted to practice in the state of GEORGIA. Furthermore, I am a member in good standing of the bar of 643543.

2) I am over 18 years of age and if called upon to testify, I could and would competently testify to the following facts, as the same are personally known to me.

3) From 2011 to 2018, I was employed by the U.S. State of Department. My last post before resigning was at the U.S. Embassy in Madrid located at Calle de Serrano, 75 28006 Madrid, Spain and my title was American Citizens Services Chief.

4) My last day of employment was March 1, 2018. Therefore, I was employed when Executive Order 13769 and 13780 and also Presidential Proclamation 98645 were issued. I was also employed and had access to all the state department guidance, cables, sample Q's and A's and instructions regarding executing all three orders and had the opportunity to review all

1

those materials.

5) All of the above guidance cables, sample Q's and A's and instructions regarding executing all three orders were sent via email to consular posts, and the cable and corresponding Q's and A's were at the top center of the CAs internal homepage for 3 to 4 months.

6) I have had the opportunity to read from pages 53 and 68 of the transcript dated Thursday, May 10, 2018 from the above caption case. Specifically, I read where Mr. Amanat stated "There's no Q & A." ... "This is the first time I am hearing about that." "Certainly, there's no reference to any such document in the documents themselves that I'm giving to your honor.

7) Those statements are inaccurate. First, there was not only one version of the Q's & A's but two, one redlined as Ms. Goldberg correctly identified. Moreover, this was common knowledge in the department and several federal agencies have access to Consular information.

8) Secondly, the Q's & A's was part of the cable and was definitely referenced in the cable itself as is with all Q's & A's.

9) On page 68 I also read where the Court is inquiring about the cable "referencing several other" documents. Mr. Amanat states that the document is "classified" and there is one with "unclassified excerpts." Having seen all these documents to the best of my recollection NONE of the documents were classified.

10) I can certainly understand why the government would not want release all of them because when read together with our training, it is understood that there really is no waiver and the Supreme Court was correct to point out that the waiver is merely "window dressing."

11) As a Consular officer previously employed by the State Department my impression and interpretation of how we as officers were to apply the waiver process was as follows:

    (a) They gave us a list of things and we would go down the list one by one until we were able to determine at all possible cost that the person was not eligible to even apply for the waiver. My understanding was no one is to be eligible to apply.

    (b) If for some reason an applicant made it through the list and we had no choice but to determine we could find an applicant eligible to apply, regardless of the PP instructions that we had "discretion to grant the waiver," we were not allowed to exercise that discretion. We were mandated to send notice to Washington that we found this applicant eligible to apply and Washington would then make the decision to grant or deny the waiver.

12) In essence what the administration was doing was "hiding" behind the doctrine of consular non-reviewability for the benefit of issuing a Muslim ban and the same time usurping all of our authority given by both Congress and the PP by disallowing the consular officer to make a decision.

13) Approval notices like the samples attached to my declaration (Ecuador, Mexico, Djibouti, Turkey) are issued at US Embassies all over the world once a case is complete, (valid medicals received, applicant interviewed, and SAOs clearances received) while the applicant is waiting for the embassy to print the visa. This is not specific to Djibouti.

14) Even when SAOs clearance expire and needs to be updated, it can be done within 24-72 hours and the visa printed, since it is merely an update. The same hold true for the medical examination.

15) I declare under penalty of perjury of the law of New York and the United States that the foregoing is true and correct.

Dated on this June 1, 2018

Christopher Richardson, Esq.

# EXHIBIT B



United States Department of State

*Washington, D.C. 20520*

FEB 2 2 2018

The Honorable
Chris Van Hollen
United States Senate
Washington, DC 20510

Dear Senator Van Hollen:

Thank you for your letter of January 31 regarding Presidential Proclamation 9645 on *Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or other Public Safety Threats* (the Proclamation), which suspended the entry into the United States of certain nationals of eight designated countries, Chad, Iran, Libya, Syria, Yemen, North Korea, Venezuela and Somalia. In particular you request information regarding the processing of waivers for nationals of these countries following the Supreme Court's December 4, 2017 stay of injunctions entered by lower courts which enjoined the implementation of the Proclamation. We are responding questions posed in your letter that relate to the Department of State. The Department of Homeland Security will write to you relating to issues under its authority.

Section 1(b) of the Proclamation stresses that it is the policy of the United States to protect its citizens from terrorist attacks and other public-safety threats and that screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. Further, the Proclamation notes that information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. It determines that the governments of Chad, Iran, Libya, Syria, Yemen, North Korea, Venezuela and Somalia had inadequate identity-management protocols, information-sharing practices, and risk factors, such that entry restrictions and limitations are required.

Section 3(b) of the Proclamation specifically excepts certain nationals of the designated countries from the Proclamation's entry restrictions, and section 3(c) provides for a case-by-case waivers of the entry restrictions. The entry restrictions of the Proclamation may be waived if a consular officer determines that the applicant meets each of the following three criteria: (1) denying entry would cause the foreign national undue hardship; (2) entry would not pose a threat to the national security or public safety of the United States; and (3) entry would be in the national interest.

As part of the visa application process, all aliens are required to submit an online visa application form. The application form requests a variety of information about the alien's history and background, including his family relationships, work experience, and criminal record. See, e.g., 8 U.S.C. § 1202(b). The visa application process includes an in-person interview and results in a decision by a consular officer. 8 U.S.C. §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. §§ 41.102, 42.62.

When adjudicating the visa application of an applicant subject to the Proclamation, the consular officer must first determine whether the applicant is eligible for a visa under the provisions of the Immigration and Nationality Act (INA). The applications of both immigrant and nonimmigrant visa applicants from the designated countries are processed in the same manner as all other applicants for U.S. visas. This processing includes screening of their fingerprints and biometric information though the Department's Consular Lookout and Support System (CLASS) database; and screening through IDENT (which contains DHS fingerprint records), NGI (the FBI Next Generation Identification database), and the Department's Facial Recognition database, which contains watchlist photos of known and suspected terrorists obtained from the FBI's Terrorist Screening Center (TSC) as well as the entire gallery of prior visa applicant photos. If an applicant from one of the designated countries is determined to be otherwise eligible for a visa under the INA, the interviewing officer must then determine whether the applicant falls into one of the exceptions to the Proclamation. Only if the otherwise eligible applicant does not fall within an exception, will the consular officer consider the applicant for a waiver. Each applicant who meets the conditions set forth in section 3(c) of the Proclamation must be considered for a waiver. There is no waiver form to be completed by the applicant.

Consular officers may grant waivers on a case-by-case basis when the applicant demonstrates to the officer's satisfaction that he or she meets the three criteria discussed above. First, to satisfy the undue hardship criterion, the applicant must demonstrate to the consular officer's satisfaction that an unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel. Second, the applicant's travel may be considered in the national interest if the applicant demonstrates to the consular officer's satisfaction that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted.

Finally, to establish that the applicant does not constitute a threat to national security or public safety, the consular officer considers the information-sharing and identity-management protocols and practices of the government of the applicant's country of nationality as they relate to the applicant. If the consular officer determines, after consultation with the Visa Office, that an applicant does not pose a threat to national security or public safety and the other two requirements have been met, a visa may be issued with the concurrence of a consular manager.

Section 3(c)(iv) of the Proclamation provides examples of the circumstances in which a waiver might be appropriate. The Department's worldwide guidance to consular officers regarding waivers is drawn directly from the Proclamation. Further, consular officers may consult with the Visa Office if a consular officer believes a case may warrant a waiver but the applicant's circumstances do not align with one of the examples in the Proclamation.

Your letter also requests statistical information about the number of applicants from the designated countries who have applied for visas and those who have received waivers. Unfortunately, some of the information you seek is not readily available in the form you have requested. Nonetheless, we can provide the information attached.

We hope this information is responsive to your concerns. Please do not hesitate to contact us further should you require additional information.

                                Sincerely,

                                Mary K. Waters
                                Assistant Secretary
                                Legislative Affairs

Enclosure: As stated

# VISA APPLICATIONS RECEIVED AND PROCESSED FROM NATIONALS SUBJECT TO PRESIDENTIAL PROCLAMATION 9645
## (From December 8. 2017 to January 8, 2018

*This non-public information is being provided to address your request as fully as possible. Not for public release without prior consultation with the Department of State.*

| | |
|---|---:|
| Applications for nonimmigrant and immigrant visas: | 8,406 |
| Applicants refused for reasons unrelated to the Proclamation: | 1,723 |
| Applicants qualifying for an exception: | 128 |
| Applicants who failed to meet the criteria for a waiver | 6,282 |
| Applications refused under the Proclamation with waiver consideration: | 271 |
| Waivers approved (as of February 15): | 2 |

# EXHIBIT
# C



United States Department of State

*Washington, D.C. 20520*

JUN 22 2018

The Honorable
Chris Van Hollen
United States Senate
Washington, DC 20510

Dear Senator Van Hollen:

Thank you for your letter of April 19 regarding the implementation of Presidential Proclamation 9645 (PP 9645) *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats,* in which you reference the letter we sent you and Senator Jeff Flake on February 22 and seek additional information about the impact of the Proclamation on the processing of U.S. visas.

We defer to the Department of Homeland Security to address your request for reports submitted by the Secretary of Homeland Security to the White House pursuant to section 4(a) of PP 9645. We further note that PP 9645 sets out the basis for the designation of the countries listed and specifies the inadequacies in identity management protocols, information-sharing practices, and other risk factors that resulted in those countries being subject to the stated travel restrictions.

As discussed in our February 22 letter, the Department's worldwide guidance to consular officers regarding when a waiver pursuant to section 3(c) of PP 9645 may be granted is drawn directly from PP 9645 itself. That letter contains further information about how consular officers determine that the applicant has met each of the three criteria for a waiver. The Department's internal operational guidance is intended for consular officer's internal use only and is not publicly available, as well as being the subject of ongoing litigation upon which we cannot comment.

The Department does not routinely maintain the statistics you have requested in the form which you have requested. We have attached the available information which we believe is responsive to your concerns. As noted on the Department's public website, Travel.State.Gov, (https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/presidential-proclamation-archive/RevisionatoPresidentialProclamation9645.html) from December 8, 2017 through May 31, 2018, more than 768 applicants were cleared for waivers after a consular officer determined the applicants satisfied all criteria and completed all required processing. (This information is updated every two weeks.) Many of those applicants received their visas. In the months since full implementation of PP 9645 began on December 8, 2017, the number of cases cleared for waivers has grown at an increasing rate. We note that the statistic provided with our February 22 letter which stated that two cases had been cleared for waivers, was as of January 8 (the attachment mistakenly indicated February 15), or only after one month of processing cases under PP 9645. The increase in the number of cleared waivers, and the decrease in the time required to clear a waiver was expected as time elapsed.

We hope this information is helpful. Please do not hesitate to contact us further on this or any other matter.

Sincerely,

Mary K. Waters
Assistant Secretary
Legislative Affairs

Enclosure: As stated

*This non-public information is being provided to address your request as fully as possible and is for your use in your legislative work.*
*Not for public release without prior consultation with the Department of State.*

## VISA APPLICATIONS RECEIVED AND PROCESSED FROM NATIONALS SUBJECT TO PRESIDENTIAL PROCLAMATION 9645
### (As of April 30 unless otherwise stated)

**(Note: The points below contain preliminary data which are subject to change. Any changes should not be statistically significant.)**

Number of NIV and IV applications from impacted nationalities who applied for visas in the P.P. 9645 covered categories:     33,176

Number of applicants found ineligible for reasons other than those covered in P.P. 9645 (e.g. INA 214(b)) so a review for eligibility under P.P. 9645 was not required:     4,900

Number of applicants who received a visa under an exception from P.P. 9645:     1,147

Number of applicants cleared for waivers:     579 (768 as of May 31)

Number of applicants interviewed, but still awaiting a determination on a waiver:     4,157